BERTHA E. BERRYMAN v. SOUTHERN SURETY COMPANY, Appellant.

Division Two, December 15, 1920.

1. **ACCIDENT INSURANCE: Death Resulting From Murder.**  If the insured was unlawfully murdered, his death resulted "directly and exclusively of all other causes from bodily injury sustained solely through external, violent and accidental means," and the beneficiary is entitled to recover on an accident policy.

2. ————: **Payment of Premium.**  If the agent of an insurance company, in dealing with a person financially able to pay the premium for a policy applied for, extends credit to him and treats the

premium as paid at the time it is delivered, no injury is done the company if the agent transmit to it, in the usual course of business, the amount of the premium; and if the insured dies after the policy is delivered, but before the premium is paid to the agent or the amount transmitted by the agent to the company, the policy is not thereby avoided.

3. ———: ———: **Waiver.** An agreement by the insured in his application that "the insurance is not effective until the policy has actually been issued by the company and the premium paid while I am in good health and free from all injury" is solely for the benefit of the company, and may be waived by an agent authorized to countersign the policy, deliver it and collect the premium; and where the agent delivered the policy, treated the payment of the premium as a cash transaction, looked to the insured for payment of the amount as a personal obligation to himself and sent the amount to the company in due course of business, his acts amounted to a waiver, although he was not actually paid until after the insured was dead.

4. ———: **Instruction: Attempted Assault.** Where the uncontradicted testimony is that deceased was not attempting to assault his murderer at the time he was shot, the insurance company is not entitled to an instruction telling the jury that if the insured was making an assault upon the murderer with a chair, with the intention of killing him, the verdict must be for the company on the accident policy; especially, where the jury might conclude from all the evidence that, if the insured did attempt to use the chair, he was doing so in defense of his own life, after discovering that his assailant was armed with a gun and was about to shoot him.

5. ———: ———: **Refusal: Covered by Others.** Where the trial court gives an instruction which is as favorable to appellant as the law will approve, it is not error to refuse or necessary to give another requested relating to the same subject-matter.

6. ———: ———: **Legal Justification: Undefined.** In a suit on an accident policy, where the insured had been killed, failure to define the words "legal justification" in an instruction telling the jury that intentional killing is presumed to be unlawful, and the jury will be justified in acting upon such presumption unless they find from the evidence that "there was legal justification" for the killing, and if they find the killing "was unlawful and without legal justification it constituted an accident within the meaning of the policy," is not error; and if defendant thinks the words, without definition, might be misleading, it is its duty to ask an instruction defining them.

7. ———: **Vexatious Delay.** If under the evidence defendant had reasonable grounds for litigating the question whether the insured lost his life as a result of an accident, and the evidence is such that, if the jury had found for defendant on that question, there could be no recovery, it is error to submit the question of vexatious delay to the jury. The penalty cannot be imposed merely because the jury, after a trial, by its verdict finds the insured's death to have been accidental; in addition, the evidence and circumstances must show that the refusal to pay was wilful and without reasonable excuse.

Appeal from Buchanan Circuit Court.—*Hon. Thomas B. Allen,* Judge.

AFFIRMED (*on condition*).

*Culver & Phillip* for appellant.

(1) The insured did not meet death solely through external, violent and accidental means, and the trial court should have so instructed the jury. Taliaferro v. Travellers' Prot. Assn., 80 Fed. 368; Lovelace v. Travellers' Assn., 126 Mo. 104; Meister v. Assurance Corp., 179 Pac. (Ore.) 913; Hutton v. Ins. Co., 267 Ill. 267, L. R. A. 1915 E. 127; Price v. Occidental Ins. Co., 147 Pac. (Cal.) 1175; Casualty Co. v. Curry, 65 So. 852. (2) The policy was not in force at the time of insured's death, because the first premium had not then been paid and the court erred in so refusing to instruct the jury. Bell v. Ins. Co., 166 Mo. App. 390; Pierce v. Ins. Co., 174 Mo. App. 383. (3) There was no evidence of vexatious delay and that question should not have been submitted to the jury and the verdict and judgment for penalties should be set aside. Non-Royalty Shoe Co. v. Phenix Assurance Co., 210 S. W. 37. (4) The court erred in admitting evidence as to the manner of payment of premiums on other policies which were not shown to contain a clause similar to the policy in question requiring payment of first premium before policy became effective. (5) The court should have instructed the jury as asked in defendant's Instruction F, that if

the insured was killed by another while making an assault with a chair held in his hand on such other, then the plaintiff could not recover. Cases first above cited. (6) The court erred in using the terms "legal justification" in the instructions asked by plaintiff without defining their meaning. Turnbow v. Dunham, 272 Mo. 65; Montgomery v. Railroad, 181 Mo. 513.

*Graham & Silverman* and *Strop & Mayer* for respondents.

(1) The death of Berryman, resulting from the shots fired by Richardson, constituted death by accident, through external, violent and accidental means. Lovelace v. Ins. Co., 126 Mo. 104; Collins v. Fidelity & Casualty Co., 63 Mo. App. 253; Phelan v. Travelers Ins. Co., 38 Mo. App. 640; Casualty Co. v. Herroll, 98 Tenn. 591, 40 S. W. 1080; Accident Co. v. Carson, 34 L. R. A. 301. (2) The delivery of the policy to Berryman, with an express waiver of the payment of the premium by the authorized agent of the defendant company, put the policy in force. James v. Ins. Co., 148 Mo. 1; Crowder v. Ins. Co., 115 Mo. App. 540; Rudd v. Ins., 120 Mo. App. 1; Manning v. Ins. Co., 176 Mo. App. 688; Bell v. Ins, Co., 166 Mo. App. 398. (3) There was ample evidence of vexatious refusal to pay and this question was properly submitted to the jury. Fay v. Ins. Co., 268 Mo. 373; Glover v. Ins. Co., 193 Mo. App. 489; Kellogg v. Ins. Co., 133 Mo. App. 463. (4) The defendant having denied the agency of Nathan Evans, the admission of evidence showing the manner of payment of premiums on other policies, even though not shown to contain a clause similar to the policy in question, was not error, because such evidence was admissible to establish the relation of principal and agent between the company and Evans, if for no other purpose. (5) Defendant's Instruction F was properly refused. It was not justified by the evidence and does not require the jury to find either that Berryman was using the chair

as an instrument of offense or that it was of a character likely to produce death or great bodily harm.  Kouns v. State, 3 Tex. App. 13;  State v. Harper, 69 Mo. 425; State v. Nueslein, 25 Mo. 111.  (6) The use of the words "legal justification" in the plaintiff's instruction, without definition of the words, was not error.  (7)  In its Instruction 1, given for it, defendant used the terms "without any just cause or provocation," which is equivalent to the words "legal justification," used in plaintiff's instruction, and therefore the defendant cannot complain of the plaintiff's failure to define the term. Harvester Co. v. Spires, 223 S. W. 803;  Anderson v. Sash & Door Co., 182 S. W. 819;  Bettoki v. Coal & Mining Co., 180 S. W. 1023.

RAILEY, C.—This action was commenced by plaintiff, as the widow of Johnson E. Berryman, deceased, in the Circuit Court of Buchanan County aforesaid, on December 14, 1916, to recover of above defendant, as beneficiary, on an accident policy, issued by it, insuring said deceased against death and injuries resulting from accident.  The cause was defended on the ground that the policy sued on was never in force, because no premium was shown to have been paid prior to the death of deceased;  and also on the ground, that death did not result, "directly and exclusively of all other causes, from bodily injury sustained during the life of this policy, solely through external, violent and accidental means (excluding suicide, sane or insane, or any attempt thereat)."

The policy is in ordinary form, and contains the language above quoted.  It was issued January 9, 1916, for a term of one year.  Deceased was killed by William Richardson, February 18, 1916.  Proof of his death was made in accordance with the requirements of said policy. Respondent is named as the beneficiary therein.  The only witness who testified as to what occurred, in respect to the killing, was William Richardson.

Both Richardson and deceased were in the employ of Drinkard-Seager-Vallery Company and engaged in the livestock business at the stockyards in St. Joseph, Missouri. Richardson was not present at the trial, but the testimony which he gave, in the case of State of Missouri vs. himself, wherein he was charged with the murder of Berryman, was offered in evidence by appellant and, by stipulation, was used as the testimony of Richardson given in said cause. It appears from Richardson's testimony that deceased complained of statements made by Richardson, which the latter conceded he had made. A quarrel ensued, and Richardson testified that he started to leave the room; that deceased said, "by God, I will knock your damned block off," struck witness behind the ear, staggered him and, as witness reached after his cap, which had fallen off, deceased kicked him in the belly, as he tried to get out. Richardson said he then went down the hall by the elevator, stopped for a second or two, and thought he would go back, but changed his mind and went down stairs; that he finally reached the Transit House Cafe, and found Rex Duncan there eating his dinner; that he asked Duncan for a gun. The latter went behind the bar, got a pistol, and asked Richardson what he wanted to do with it. He said to Duncan, "I just want to four-flush." He got the gun, put it in his left-hip pocket, and walked out. The scabbard was on the pistol. He testified that he then went back to the office of his company and found Vallery and Berryman talking together. He said to deceased, "John, I would like to talk to you in the other room." Richardson turned, walked towards the room, and says deceased remarked, "I will go any God-damned place with you," and they both entered the room. Richardson, in chief, testified as follows:

"Q. What did he do when he came in the door? A. He walked in the room; pushed the door shut and snapped the snap on. I said, 'Set down, and let's talk this over. I think you and I can fix things up, and I

believe I can convince you that you are wrong.' He grabbed the chair with his right hand and said, 'God damn you, I have been wanting you here for a long time; I am going to knock your God-damned head off.' He came at me with the chair; I ran my hand in my pocket. I was a little slow running my hand in my pocket, and he grabbed the gun with his left hand and as he grabbed the gun I pulled the trigger. I think it was right against him. He dropped the chair and grabbed me by the arm with his right hand and threw me on the table. I said, 'Stop, John.' I wrenched my gun from his hand and I shot twice—I didn't know—he went down on the floor and I stepped around him and set the chair down, unlocked the door, went out, walked over to the telephone and called my wife and said, 'I am in trouble.' ''

On cross-examination, Richardson testified:

''Q. You thought it was necessary for you to get a gun for you to get along in a nice peaceable way. A. Yes, sir, I did. . . .

''Q. What did you mean by, 'to make a four-flush'? A. Well, I wanted something with me to protect myself. I had already known I wasn't able to fight Mr. Berryman, and I felt I ought to have something to protect myself, if he assaulted me.

''Q. And when you went back to talk to Mr. Berryman you felt you need a gun? A. Yes, sir. . .

''Q. What did you expect to do with the gun if you didn't expect to shoot? A. I expected to keep him off of me if he went to jump on me. . . . I thought I would talk to Mr. Berryman and try to adjust our matters in a nice, respectable way, and get into no fight and have no trouble. . . .

''Q. All you said to Mr. Berryman was, 'I am ready to talk to you now, Jack. Come in this room with me'? A. Yes, sir.''

Richardson testified that when deceased entered the room, he (deceased) locked the door and put his

hand on the chair; that he (witness) was at west end of table. He further testified:

"Q. *You didn't offer to pull your gun then when he locked the door, did you? A. No, sir.*

"Q. Where was this chair setting that Mr. Berryman took hold of? A. Well, I think it was setting at the typewriter that was in the room, right in the *east* corner. . . .

"Q. *You asked Mr. Berryman to get a chair and be seated, didn't you? A. Yes, sir.* . . .

"Q. After he put his hand on the chair, what did he do? A. I spoke to him and asked him to be seated, and he says, 'God damn you, I have got you where I want you, I am going to knock your — — — block off.'

"Q. *What did you think he was going to do when he put his hand on the chair? A. I didn't give that a thought. I didn't think what he was going to do.*

"Q. *There was nothing hostile about his putting his hand on the chair, was there, Mr. Richardson? A. No, not necessarily.*"

He said Berryman was dead within three or four minutes after he entered the room. This witness further testified:

"Q. You say he had this chair lifted over your head? A. No, sir, I didn't say any such thing. I said he had this chair in his hand; he was coming with it in his hand.

"Q. Was it up or down? A. He was coming up.

"Q. Describe how? A. He had hold of the chair and was coming with it.

"Q. Was it up or down? A. It was about even with his body or head.

"Q Were the legs of the chair down or up? A. I kind of think the *legs* of the chair were *down*. . . .

"Q. Had you drawn your pistol at that time? A. When he started towards me with the chair, I drew my pistol.

"Q. What did you say to him? A. *I didn't say anything until he had me on the table.*

"Q. You had shot him before that? A. Yes, sir.

. . .

"Q. Then you shot him twice after he had you in that position? A. I pulled the gun up in some way and shot twice. . . .

"Q. *When did Mr. Berryman drop the chair?* A. Well, sir, I don't know that I can tell you when he dropped the chair. *He must have dropped it when he got close to me.*"

Deceased was blind in his right eye.

Dr. Lynch, the Coroner, testified that deceased was shot in the breast. "Q. Was that shot fired from the front or in the rear? · A. It was fired from in front." He said that either of the three shots would have caused death. He was shot in the neck and in the back of his head. He gave it as his opinion that the shot in the back of the head killed him immediately. He said deceased was a large, well-built man and weighed about two hundred pounds.

The premium due on the policy at the time of its delivery was not paid until several days after Berryman was killed. It was then paid to Nathan Evans, the agent who delivered the policy to deceased. The evidence relating to this subject will be considered later.

The case was tried before a jury, and resulted in a verdict for plaintiff for the face of said policy, $7,500, and interest, amounting to $557.57, together with $750 for vexatious refusal to pay, and $1,000 attorney's fees. Defendant, in due time, appealed the cause to this court.

The rulings of the court, in respect to the admission and exclusion of testimony, the giving and refusal of instructions, as well as such other matters as may be deemed necessary, will be considered in the opinion.

I. We are called upon to construe the insuring clause of the policy sued on, which reads as follows:

Unlawful Murder. "(I) The effects resulting directly and exclusively of all other causes, from bodily injury sustained during the life of this policy, solely through external, violent and accidental means."

Under Proposition 1 of its "Points and Authorities," appellant contends, that: "The insured did not meet death solely through external, violent and accidental means, and the trial court should so have instructed the jury."

The following authorities are cited in support of the above contention: Taliaferro v. Travelers' Protective Assn., 80 Fed. 368; Lovelace v. Travelers' Assn., 126 Mo. 104; Meister v. Assurance Corporation, 179 Pac. (Ore.) 913; Hutton v. Ins. Co., 267 Ill. 267, 108 N. E. 296; Price v. Occidental Ins. Co., 169 Cal. 800, 147 Pac. 1175; Prudential Casualty Co. v. Curry, 65 So. (Ala.) 852.

The opinion in the Taliaferro case was written by THAYER, J., and some of the facts, which distinguish the case from the one at bar, are as follows:

"Henry Frith went outside of the gate, as he was requested to do, and entered into a conversation with the deceased, which was carried on at first in a low tone, and apparently in a friendly spirit. What was said by the parties at first was not understood. The conversation finally became louder, and both parties seemed to became angry. Very soon Frith was heard to say, "I don't want any trouble,' and the deceased replied, 'You must not insult me,' to which Frith answered, 'You must not insult me.' Thereupon the deceased was heard to say 'he must have revenge; put yourself in shape,' whereupon Frith pulled off his coat, and threw it upon the fence. Immediately thereafter the deceased pulled a pistol, rushed upon Frith, and struck him with the pistol in the face, knocking him against a tree. Frith then drew his own pistol, and shot the deceased several times, inflicting wounds of which he shortly thereafter died."

On page 370, Judge THAYER, speaking of deceased, said: "He was the first to draw a deadly weapon, accompanying that action with the exclamation that 'he must have revenge,' and at the same time warning Frith

'to put himself in shape.' This can be regarded in no other light than an invitation to a deadly encounter, in which the deceased voluntarily put his life at stake, and deliberately took the chances of getting killed. . . . The case on which counsel for the plaintiff in error appears to place most reliance is Lovelace v. Association, 126 Mo. 104, 114, 28 S. W. 877, but in that case, while it appeared that the deceased had engaged in a quarrel which he might very well have avoided, it did not appear that he had drawn a weapon of any sort, or that he knew, when he engaged in the quarrel, that his opponent was armed. So far as the case showed, the deceased had no reason to expect, when he engaged in the encounter, that it would result in any bodily harm to either party, and for that reason the court appears to have held that the unexpected result of the affray was an accident, so far as the deceased was concerned."

We have set out the facts very fully in this case. There is no evidence tending to show, nor is it claimed, that deceased had any gun or knife in either of the encounters which he had with Richardson. It is equally as clear that Richardson was not armed when deceased struck him in the first encounter. Richardson left the scene of the first affray, without any intimation that he intended to return and renew the conflict. After obtaining and secreting the pistol in his hip pocket, he went back to the room where deceased was located, called him by his given name, and asked him to come into the other room. There is nothing in the testimony to indicate that deceased knew, or had reason to believe, that Richardson was armed, or that he was inviting deceased into said room for the purpose of renewing the fight. On the contrary, it can hardly be believed, that deceased would have voluntarily followed Richardson into the other room, without taking some means to protect himself, had he known or thought that Richardson was then armed. After both had arrived in the room, Richardson said he asked deceased to take a chair; that the latter

had his hand on one, near the typewriter, and that deceased then came towards him with the chair, but he nowhere testified that deceased struck him, or struck at him with the chair. On the contrary, he testified that deceased "must have dropped it when he got close to me." We think the evidence is clear that Richardson, after obtaining the pistol, induced deceased to come into the other room, away from his companion, in order that he might obtain revenge for the injury previously inflicted upon him by deceased. The testimony of Richardson in this case was that given by him in the criminal court where his liberty was at stake. The mouth of deceased was closed in death, and no one was present to contradict Richardson, yet, as shown by the testimony previously set out, we think the jury was fully justified in finding that deceased was unlawfully killed by Richardson, without any reason upon the part of deceased for believing that Richardson was armed and intended to do him bodily harm.

The facts presented in the other cases cited can be distinguished from those at bar. We are satisfied with the principles of law declared in Lovelace v. Travelers' Association, 126 Mo. 104. To same effect are Collins v. Fidelity & Casualty Co., 63 Mo. App. 253; Union Casualty Co. v. Harroll, 98 Tenn. 591; Interstate Business Men's Accident Assn. v. Lester, 257 Fed. 225.

The foregoing contention of defendant does not meet with our approval, and is accordingly overruled.

II. Appellant contends, that "the policy was not in force at the time of the insured's death, because the first premium had not then been paid and the court erred in so refusing to instruct the jury."

Payment of Premium.

In support of above contention, we are cited to the commencement of said policy, which reads: "In consideration of the premium of sixty-five dollars, and the statements in the application for this policy, a copy of which is endorsed hereon and made a part hereof," etc.

We are also referred to that part of the application which reads: "16. I understand and agree that the insurance is not effective until the policy has actually been issued by the company and the premium paid while I am in good health and free from all injury; and that the company shall not be bound by any knowledge of or statements made by or to any agent unless written hereon."

The above application is addressed to the Southern Surety Company, at its general offices in St. Louis, Missouri. It is signed: "The travelers Insurance Company, by John E. Akern, Secretary. Johnson E. Berryman, Insured." It was dated at Hartford, Conn., on January 24, 1916.

We are not advised as to why the above application was addressed to the appellant, and signed by the Travelers Insurance Company. It is clear from the evidence before us that Nathan Evans was the accredited agent of appellant at St. Joseph, Missouri, when the policy in controversy was written and delivered to deceased, although the name of Alfred W. Evans, his son, was used for that of Nathan Evans. In other words, the latter testified, the business, at the instance of defendant, was done by him in the name of his son.

Nathan Evans was examined as a witness in behalf of defendant. On cross-examination he testified:

"Q. The policy that was issued to Johnson E. Berryman purports to be signed by A. W. Evans. Did your son or A. W. Evans, ever countersign that? A. No, sir, I signed it.

"Q. That is countersigned by you? A. Yes, sir.

"Q. Did you have authority, and was it your custom, to countersign and deliver policies at St. Joseph? A. Yes, sir.

"Q. What has been the custom during your agency for this company, what was its custom with reference to requiring payment at the time the policy was issued? A. We did not require it.

"Q. You did not require it? A. No, sir.

"Q. And such was not the custom? A. Such has not been."

He testified that this policy was issued on January 9, 1916, but was held up until after January on account of the one-eye clause, that he sent the company a remittance for the February account which covered the Berryman policy; that, at any rate, defendant got the money. Witness further testified:

"Q. In any event they kept an account with you of the policies that you issued and delivered, did they not? A. Yes, sir.

"Q. It was your custom to report the policies when issued? A. Yes, sir.

"Q. You were charged by the company with the amount of the policies when you reported their issuance? A. Yes, sir.

"Q. That was the custom and method of their doing business? A. Yes, sir.

"Q. The agent is charged with the premium and if he saw fit to extend a credit, why, he did so, that is right, is it? A. Yes, sir.

"Q. That was your usual method of doing business? A. Yes, sir.

"Q. And the company, as you say, always charged you with the account upon the issuance of the policy? A. That is right."

He said Berryman told him he would not give him a check for the premium when the policy was delivered, but would hand it to him in a few days, He told Berryman this was satisfactory. He met Berryman in the Exchange Building one day, and deceased asked him to come back on the elevator and he would pay him the premium on that policy. He told Berryman he was in a hurry, and he could hand it to him the next time he came down, or that he would see him later. Witness further testified as follows:

"Q. You representing this defendant and having authority to issue policies, at the time you did deliver this policy, delivered it to Berryman, you delivered it

with the understanding and intention that it was to be in force at that time, didn't you? A. Surely."

Other facts and circumstances were given in evidence tending to corroborate the foregoing testimony of Evans.

If the agent, in dealing with men who are financially good, extends credit to them, and treats the premium as paid at the time the policy is delivered, it inflicts no injury upon the principal, if the agent transmits to the principal in the usual course of business, the premium which the insured was expected to pay. If this is considered a matter of importance, there is no reason why the agent might not be required to give a bond, covering the loss, if any, occasioned by non-payment of the premium.

Aside, however, from the foregoing, there are other reasons for overruling above contention. It is manifest, that the above quoted provision in respect to the payment of the premium, is inserted solely for the benefit of the insurer, and may be waived by an agent authorized to countersign the policy, deliver same and collect the premium thereon. [Edwards v. Business Men's Acc. Assn., 221 S. W. (Mo. App.) 422; Dunken v. Aetna Life Ins. Co., 221 S. W. (Tex.) 691; Malone v. State Life Ins. Co., 213 S. W. (Mo. App.) l. c. 878; Mooney v. Ins. Co., 80 Mo. App. l. c. 195; James v. Mutual Life Assn., 147 Mo. l. c. 10, 11, 12; Titus v. Ins. Co., 71 N. Y. 419; Hollis v. State Ins. Co., 65 Iowa, 454, 12 N. W. 774; Joyce on Insurance, sec. 1353.]

In this case, the agent delivered the policy, treated the payment of premium as a cash transaction, looked to Berryman for repayment to him as an individual obligation, and sent the amount of the premium to defendant in due course of business, as he would have done had the premium been paid in cash. This subject is considered and discussed with marked ability, by STURGIS, J., in the Malone case supra, where numerous authorities are cited and the conclusion above reached is fully sustained.

Under the facts heretofore stated, defendant is estopped from showing that the policy is void, for failure of the deceased to pay the first premium in cash when the policy was delivered. [Dobyns v. Bay State Ben. Assn., 144 Mo. l. c. 109, and cases cited; Mo. State Life Ins. Co. v. Salisbury, 213 S. W. (Mo.) 791; Dunken v. Ins. Co., 221 S. W. (Tex.) l. c. 695, and cases cited.]

WHITE, C., in the Salisbury case, supra, at page 791, correctly states the rule of law, in respect to this matter, as follows:

"It is held, where a policy acknowledges the receipt of the first premium, that such receipt might be disputed for some purposes as any other receipt, but that the payment of the first premium, as recited, could not be disputed for the purpose of invalidating the instrument."

Without prolonging this branch of the discussion, we are of the opinion that the foregoing contention of appellant, as applied to the facts of this case, is unsound and should be overruled.

III. Appellant complains of the action of the trial court in refusing to give its instruction marked "F," which reads as follows:

"If you believe from the evidence that at the time John E. Berryman was shot and killed by William Richardson, he, the said Berryman, was making an assault upon the said Richardson with a chair held in his hand, with the intention of killing the said Richardson or doing him great bodily harm, and that in resisting such assault so being made by said Berryman said Richardson shot and killed said Berryman, then your verdict will be for the defendant."

*Aggressor.*

We have very fully set out the evidence of Richardson as to what occurred when he killed Berryman, and have fully considered the law relating to this subject under Proposition I supra. Aside, however, from the foregoing, the evidence does not clearly show that deceased was attempting to *assault* Richardson with the

chair. On the contrary, deceased had dropped the same before he was shot. Richardson testified that "he must have dropped it when he got close to me."

Again, Richardson had armed himself, went back to the scene of former conflict, and invited deceased into the other room, away from his companion. This instruction ignores the fact that the jury may have concluded from all the evidence that deceased, if he did attempt to use the chair, was doing so in defense of his own life, after discovering that Richardson was armed with a gun and was about to shoot him.

The court, however, at the instance of defendant, gave to the jury instruction numbered I, which reads as follows:

"If you believe from the evidence that John E. Berryman assaulted William Richardson without any just cause or provocation, and that at the time he committed said assault he knew, or had reasonable cause to believe, under all the facts and circumstances, that said Richardson was armed with a deadly weapon, then said Berryman is presumed and must be held to have known that as the probable consequences of making said assault he was liable to be killed or suffer great bodily harm, and under such circumstances your verdict must be for the defendant."

The foregoing instruction presented the case to the jury in terms as favorable to defendant as the law would allow. There was, therefore, no necessity for the giving of said instruction "F," as the subject-matter of same was fully covered by instruction numbered I supra. We are of the opinion, that the court committed no error in refusing said instruction as asked.

IV. The trial court is charged with having committed error in giving plaintiff's instruction numbered 2, without defining "legal justification." Said instruction reads as follows.

"The court instructs the jury that the intentional killing with a deadly weapon of one human being by

another is presumed in law to be unlawful, and the jury
will be justified in acting upon this presump-
tion, unless upon all of the facts and cir-
cumstances as detailed in evidence the jury find that
there was legal justification on the part of Richardson
in killing said Berryman. And the court further in-
structs the jury that if they find and believe from the
evidence that the killing by Richardson of Berryman,
as detailed in evidence, was unlawful and without legal
justification, then the said killing of Berryman by Rich-
ardson constituted an accident within the meaning of
the policy sued upon in this case, notwithstanding the
act of said Richardson in killing said Berryman was in-
tentional on the part of said Richardson.''

*Justification.*

Richardson was not on trial in this case. The
jurors were informed, in substance, that the intentional
killing of deceased by Richardson, with the gun men-
tioned in evidence, was presumed to be unlawful, unless
the killing was done in self-defense. It went further,
and told the jury that if the latter believed from the evi-
dence that Richardson's act in killing deceased was un-
lawful and without legal justification, etc., the said kill-
ing constituted an accident, etc. The defendant sus-
tained no possible injury in the use of the words "and
without legal justification," as the jurors were required
to find that the killing of deceased was unlawful. If
counsel for appellant thought the jury might be misled
by the use of the words "without legal justification,"
they had the right to ask an instruction defining said
language. [Browning v. Railway Co., 124 Mo. l. c. 71-2;
Wheeler v. Bowles, 163 Mo. 398; Smith v. Fordyce, 190
Mo. l. c. 30; King v. St. Louis, 250 Mo. l. c. 514; Powell
v. Railroad, 255 Mo. l. c. 453-4; State ex rel. United
Rys. v. Reynolds, 257 Mo. l. c. 30; Winterman v. Rys.
Co., 203 S. W. l. c. 487; O'Hara v. Lamb Const. Co.,
206 S. W. (Mo. App.) l. c. 256; Cook v. City of St.
Joseph, 220 S. W. (Mo. App.) l. c. 694.] They were
content, however, in their instruction numbered I supra,

given by the court at their instance, to use in substance the same language complained of in above declaration. It reads as follows:

"If you believe from the evidence that John E. Berryman assaulted William Richardson without any just cause or provocation" etc., your verdict must be for defendant.

We are of the opinion, that the foregoing contention is without merit, and should be overruled.

V. It is insisted by appellant that there was no evidence of vexatious delay, and that the court committed error in submitting this question to the jury.

Vexatious Delay.　There are some proceedings, in respect to defendant's conduct, shown by the record, which are not worthy of commendation, yet, taking the case as a whole, we are of the opinion that appellant had the legal right, on the evidence before us, to litigate with plaintiff the question as to whether deceased lost his life as the result of an accident. Richardson was the only eye witness to the killing. The liability of defendant depended upon the testimony which Richardson gave at the trial. If the jury had found for defendant upon this issue, there could have been no recovery. On the other hand, it was the province of the jury to determine whether the death of deceased was the result of an accident, or whether he should have anticipated that death or bodily harm might come to him, by pursuing the course which he took, at the time of the tragedy.

Plaintiff bases her right of recovery, as to the penalties allowed, on Section 7068, Revised Statutes 1909.

In the recent case of Non-Royalty Shoe Co. v. Assurance Co., 277 Mo. l. c. 422-3, 210 S. W. 37, Faris, J., speaking for this Division, in construing the above section, said:

"We are convinced that a vexatious refusal to pay an insurance loss is not to be deduced from the mere fact that upon suit the verdict is adverse to the defend-

ant. [Patterson v. Insurance Co., 174 Mo. App. 44; Keller v. Insurance Co., 198 Mo. 440.]   If the fact of an adverse decision is to constitute the sole and decisive test, it would be fairly plain that this court was in error when it held the statute to be constitutional.   For it is only upon the fundamental ground of a vexatious refusal to pay that the penalty inflicted by the statute can be upheld.   The defendant is to be allowed to entertain an honest difference of opinion as to its liability, or as to the extent of such liability under the contract of insurance, and to litigate that difference; otherwise, the provision of the statute is obviously so shot through with duress as to be invalid upon any view.   It is from the very nature of the case, and from the protean form which the facts of the case assume, difficult, if not impossible, to frame any general rule for use in determining when a refusal to pay is vexatious and when it is not.   Judge TRIMBLE, of the Kansas City Court of Appeals, has announced a rule which commends itself to us so far as it goes, and it goes as far as it is wise or safe to go in announcing a rule to govern cases wherein the facts are as variant as we find them in insurance cases upon this question.   This rule reads thus:

" 'And while affirmative proof is not required to show vexatious refusal, yet the penalty should not be inflicted unless the evidence and circumstances show that such refusal was wilful and without reasonable cause as the facts appeared to a reasonable and prudent man before the trial; and merely because the judgment, after trial, is adverse to defendant's contention, is no reason for inflicting the penalty,' [Patterson v. American Ins. Co., 174 Mo. App. l. c. 44.]''

Having reached the conclusion, that defendant had reasonable grounds for defending the case upon the merits, in respect to foregoing matter, we are of the opinion that the question of vexatious litigation ought not to have been submitted to the jury in this case.

On June 26, 1917, the court entered a judgment upon the verdict of the jury in favor of plaintiff for

State ex inf. Bothwell v. Schuster.

$8,057.50, being the amount then due on the policy, and likewise entered, as a ·part of said judgment, in the form of penalties and attorneys' fees, $1,750. In our opinion, the above judgment is excessive as to said sum of $1,750, allowed as penalties and attorneys' fees.

If respondent will remit, as part of said judgment herein, within twenty days from the filing of this opinion, the said sum of $1,750, as of the date of said judgment, the remainder of said judgment will stand affirmed; otherwise, the cause will be reversed and remanded for a new trial. *White* and *Mozley, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAILEY, C., is hereby adopted as the opinion of the court. All of the judges concur,