John W. Fee, Appellant, v. Zurich General Accident and Liability Insurance Company, Ltd., Appellee.

Gen. No. 8,329.

Opinion filed October 23, 1929. Rehearing denied, opinion modified and refiled May 31, 1930.

DOYLE, SAMPSON & GIFFIN, TERRY LINDNER and ALFRED F. NEWKIRK, for appellant.

CHARLES S. ANDRUS, for appellee.

Mr. Justice Niehaus delivered the opinion of the court.

John W. Fee, appellant, commenced this suit in the circuit court of Sangamon county against the appellee, Zurich General Accident and Liability Insurance Company, to recover the amount of loss sustained by him under the provision of an insurance policy issued to him by the appellee, which provides indemnity for robbery committed in his store in the City of Springfield. Appellant's store was ''robbed'' in the evening of October 18, 1927 by an unknown bandit. No question is raised about the amount of loss sustained by the appellant; and the evidence shows conclusively that the loss sustained was $4,208.58; nor is there any dispute about the fact that a robbery was committed. It appears from the evidence that the appellant was the owner of a retail jewelry business which he carries on in a storeroom known as 218 South Sixth Street in the City of Springfield. P. A. Merlo, who has been in the appellant's employ for a number of years, by arrangement with appellant had charge and control of the store and the business and the property of appellant in the store in the absence of the appellant; and he opened the store for business in the morning and closed it in the evening; and carried the key to the store for that purpose; he also had the combination of the safe lock; and had the secret of how to get into the inner compartments of the safe, where the diamonds and costlier jewelry were put for safe-keeping and the money, after the close of business. The evidence clearly shows that he had actual charge, custody and control of the goods and chattels, jewelry and money of appellant's business, when the appellant was not there himself; and upon Merlo rested the duty of safeguarding the property of the business, and the valuable jewelry, diamonds and money, which it was his duty to place in the inner compartments of the safe at the

closing of business and whenever it was necessary for their security; and Merlo was custodian of the goods and property in the store and on duty as such custodian in the absence of the appellant whenever he was on premises and was so on the evening of the robbery. He had closed the store about 5:30 or 6 o'clock on that evening, and had gone to the home of his daughter, which was his place of residence. Shortly after he had reached his residence, the following incidents occurred which culminated in the robbery of the store. Concerning these incidents, Merlo who was a witness, and whose testimony is not contradicted, testified as follows:

"A short time after I reached home the door bell rang. I do not think it was seven o'clock. The granddaughter went to the door and said somebody wants to see Mr. Merlo and then I went to the door. The man said 'I want to speak to Mr. Merlo,' and I said: 'I am Mr. Merlo.' He said he wanted to see a house which I owned on West Canedy Street, which I was offering for sale and he wanted to see it right away. I went in the house to get my hat and a key to the house on West Canedy.

"I went out of the house and closed the door and as soon as I got out this man pointed a revolver at me and said: 'I know you have the key to the John Fee store and I want you to come right away, if you don't come I shoot you right away, go ahead of me.' I didn't know what to do, I wanted to save myself, I wanted to save the store, but I didn't know what excuse to give. I told him that business wasn't very good, that I don't think he ought to do a thing like that, because business wasn't good and there wasn't any money. He said he didn't believe me and to go right ahead or he would shoot me. He had the gun pointed at me and threatened to kill me.

"We went down from my daughter's house and walked west to Pasfield and then south one block to Cook Street, then east on Cook Street to Second Street, then north on Second Street to Capitol Avenue, then east on Capitol Avenue to Sixth Street, then on the west side of Sixth Street north to across from the store, where we crossed Sixth Street to the store.

"On the way down town I looked for a policeman but I didn't see any and I didn't see anybody else that I knew. I also thought that the night watchman would be there about the time we got there, but I didn't see the night watchman. Mr. Bogardus would be one of the night watchmen for whom I was looking, but I didn't see anybody that I knew.

"All the way down to the store the man had a gun in his hand in his pocket and the gun was all the time pointed toward me. The man didn't say anything on the way up town until we got to the store when he said open the door quickly because I am going to shoot you. I opened the door and we went to the safe where he said 'Open the safe.' I was very excited, didn't know what I could do and didn't believe I would be able to open the safe, but I didn't tell him anything. I turned the combination to the safe and it opened and then I took the key to the second door and opened it. The man pulled on the little steel door of the strong box inside the safe and then he said 'Open that door.' I said I didn't have the key, but he said you find the key and if you don't find it right away, I'll shoot you. Open this door right away. I knew where the key was and I took it and opened the little door. He took the package of diamonds and put it in his pocket. He grabbed up the bills but didn't grab the change.

"He opened all the drawers in the safe, looked in them, and afterwards closed them. I told him that some of the drawers had jewelry work, and that it was not valuable. Afterwards he looked at two trays

of rings and he took the three best ones. The others he left in the safe.

"Then he said 'Shut.' I closed the drawers including the strong box, and the inner door, and he closed the outside door and turned the combination.

"He took the wallet which had the diamonds from the strong box. He didn't open the wallet, just put it in his pocket the way it was. He took three rings and put them in his pocket. He took money, I didn't know whether he took checks or not, but it didn't look like he took checks, because I just saw money, and no change. He put that in his pocket and he had it in his pocket when he left.

"He turned the combination of the safe and we went out the outside front door. I locked the door. He then said that he would take me home and we went back the same way we come, on Second Street almost to Edwards Street, and we stopped in a dark place on the west side of Second Street, between the Centennial Building and Edwards Street. . . .

"After we got to the place by the Centennial Building he said to stop and we stayed there a little while, maybe fifteen minutes. All this time this man talked rough and cursed very bad. He said he wanted to shoot me. He said that I was going to call the police to arrest him, but I didn't say anything. He put the revolver up to me and I said I wouldn't call the police if he would let me go. He said he didn't believe me and looked like he would kill me.

"After I promised not to call the police but said I would tell the boss, he said all right and let me go. . . ."

The purpose of the policy which was issued to the appellant by the appellee company according to its terms, was "To indemnify the Assured for loss of or damage to money and securities and merchandise usual to the business of the Assured stated in Item

4 of the Declarations, and furniture, fixtures and other property, occasioned by robbery or attempt thereat, committed during the hours specified in said Section (b), within the Assured's premises.''

Robbery is defined in the policy as follows:

''Robbery as used in this Policy shall mean a felonious and forcible taking of property: by violence inflicted upon a custodian having the actual care and custody of the property at the time or by putting such custodian in fear of violence; or by an overt felonious act committed in the presence of a custodian and of which such custodian was actually cognizant at the time.''

It is apparent that the forcible and felonious taking of appellant's property from his place of business under the terms of the policy issued to him was a robbery, for which the appellant would be entitled to indemnity if Merlo, who was present in the premises at the time of the robbery can be legally considered a custodian of the property which was lost to appellant by the robbery. The appellee company disclaims liability under the policy in question because it contends that at the time of the robbery no custodian was in the premises who had ''the actual care and custody of the property'' taken; and this is the main contested question presented for review; and it concerns the provision in the policy referred to requiring the presence of a custodian in the premises on duty at the time of the commission of a robbery.

The trial of the cause was by the court, a jury having been waived. The trial court sustained the appellee's contention and rendered a judgment barring appellant's right of recovery. This appeal is from the judgment rendered.

A careful consideration and review of the evidence leads us to the conclusion that the requirement of the policy concerning a custodian was complied with by

the presence of Merlo in the store at the time of the robbery. The only inference which can be drawn from the evidence is that he was the custodian of the property which was the subject of the robbery, and at the time of the robbery had actual charge and custody thereof. The evidence also shows that he realized his obligation as custodian and his duty as custodian to safeguard the property in his charge and tried to perform his duty to safeguard the property by making the attempt to save the diamonds and money which were in the inner compartment from the grasp of the robber by representing to him, when commanded to unlock the inner compartment that he did not have the key to the compartment and therefore could not unlock it. The ruse was not successful, but it shows that Merlo was alert to try to save as much of the property which was in his charge and under his control as he could. There is no provision in the policy which requires the custodian to have been on the premises any particular length of time prior to the perpetration of the robbery; nor would it have made any difference in the result; nor is there any provision concerning the manner in which he gets into the premises; the substantial requirement is that there be a custodian there at the time of a robbery who has actual care and custody of the property which is the subject of the robbery; and if a custodian was present and had actual charge and custody of the property, then he was on duty as custodian. We conclude therefore that the requirement of the policy referred to was complied with by Merlo's presence and conduct at the time of the robbery. Insurance contracts such as the one in question should be construed in accordance with the objects and purposes which the parties had in mind in entering into them, and which they sought to accomplish. 13 C. J. 540; *Briquette Fuel Co. v. Davis,* 134 Ill. App. 343. The clear purpose of the policy in question was to indem-

nify the appellant for loss he might sustain by just such a robbery as was committed on his premises and the rule is also well settled that provisions and exceptions which tend to limit the liability of the insurer should be construed most strongly against the party preparing the contract for whose benefit they are inserted. This is emphasized in *Joseph v. New York Life Ins. Co.*, 308 Ill. 93, where the court said: "If doubts exist, the language must be liberally construed in favor of the insured, so as not to defeat, except by clear and certain language, his claim to indemnity."

For the reasons stated, the judgment is reversed and the cause remanded with directions to the trial court to enter a judgment in favor of the appellant for the amount of his loss, which the evidence shows to be $4,208.58.

*Reversed and remanded with directions.*