JOHN P. DIXON, Respondent, v. BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, a Corporation, Appellant, No. 43873—285 S.W. (2d) 619.

Court en Banc, October 10, 1955.

Rehearing Denied, December 12, 1955.

*George L. Gordon, Henry I. Eager, Donald W. Johnson* and *Kenneth E. Midgley* for appellant; *Gordon & Gilmore* and *Blackmar, Swanson, Midgley, Jones & Eager* of counsel.

582

*Lymán Field* and *Rogers, Field & Gentry* for respondent.

584.

[622]   COIL, C.—This case came to the writer on reassignment.

John P. Dixon, respondent (herein called plaintiff), was the insured in an accident and health policy (containing also a provision for a death indemnity) issued by appellant, Business Men's Assurance Company of America (herein sometimes called defendant or BMA). Plaintiff had verdict and judgment for $8,187.50, including indemnities allegedly due under the policy, "vexatious penalties," and attorneys' fees. BMA here contends that the trial court erred: in failing to direct a defendant's verdict; in giving an instruction; in submitting the ·question of damages and attorneys' fees for vexatious refusal to pay; and in failing to discharge the jury because of alleged misconduct on the part of plaintiff's counsel.

Plaintiff, 59, at trial time, was a machinist for the Missouri Pacific Railroad Company. He had obtained an accident and health policy from BMA in March 1946. He was in the Missouri Pacific Hospital in St. Louis from September 16 to September 24, 1947. (According to plaintiff, the only purpose of the hospitalization was for an operation on his jawbone in order that dentures would fit properly.) On September 25, 1947, he notified BMA of his confinement "for an operation on Lower Mandible performed by Dr. W. A. Shinneman". When BMA's agent delivered a check for $40 as indemnity for the hospital confinement, conversations occurred which resulted in the execution by plaintiff, on October 22, 1947, of an application for a new policy like and in addition to the one then in force. As a result, the policy giving rise to the present controversy was issued, dated October 22, 1947.

Of the 35 questions in the application, only five (or portions of them) and the answers thereto are material to the issues:

"1. Are you in good health and free from any bodily impairment? (If not, explain). [A] Yes.

"2. Have you consulted or been treated by any physician, surgeon or practitioner within five years? (Give full particulars, including date, name and address of physician). [A] Oct. 1, 1947. Oper. on jaw bone. Alveolectomy. Dr. Shinnmann. Mo. Pac. Hosp. St. Louis, Mo.

"4. Has any physician ever given an unfavorable opinion of your physical condition after either formal or informal examination, or have you ever changed your residence on account of your health? (If so, give particulars). [A] No.

"7. Do you now or have you had any of the following? (a) * * * Arthritis, * * *? Dates-Duration-Results-Doctors. [A] No.

"35. * * * Do you represent each and all of the foregoing answers to be true and complete? [A] Yes."

[623] Plaintiff had worked regularly without incident from September 25 until November 18, 1947, when he sustained an injury to his lower back which totally disabled him continuously to trial time, May 25, 1953. He was hospitalized in the Missouri Pacific Hospital as a result of this injury from April 10 to April 20, 1948. Plaintiff was paid monthly indemnities for total disability under both policies through June 1948.

In May 1948, Ralph E. Weaverling, then Director of Field Service for BMA, reviewed plaintiff's policies and file pursuant to company routine requiring a review of cases in which indemnities had been paid for six months. As a result, he obtained from plaintiff a written authorization to Missouri Pacific Hospital to furnish BMA information concerning plaintiff, including hospital and medical records, in the hospital's possession. Pursuant to the authorization and a request by BMA, the hospital sent a letter dated July 12, 1948, and received by Weaverling of BMA on July 16, 1948. (That letter will sometimes be called the hospital letter.)

Weaverling took a portion of the hospital letter to BMA's chief underwriter and inquired "if a history of that kind would have permitted the company to have issued the policy that was issued to Mr. Dixon on October 22, 1947". Upon being informed that the company would not have issued the policy "under these conditions had they known of it", Weaverling shortly thereafter stated the company's position to plaintiff as follows: "* * * that the policy was improperly issued and we did not know until we had received the hospital report from St. Louis with regard to the impairment that was recited in the hospital record and I told him at that time that the company would discontinue payments that had already been paid for seven months on this policy and that we would ask for a refund of $700 that had been made as an overpayment."

After other meetings and negotiations between Weaverling and Dixon, during some of which plaintiff was represented by an attorney, a settlement was effected and a release executed by plaintiff. (The

number, details, and effect of the meetings and negotiations which culminated in the settlement and release are described and argued extensively by counsel for both parties. In our view, these matters are not material on the narrow issue which determines submissibility and therefore we do not include those details in this statement.) Suffice to say, it is admitted that on September 16, 1948, plaintiff, with the approval of his attorney, executed a release (and at the same time surrendered the policy), by the terms of which the stated consideration was a payment by BMA to plaintiff of $275 and the waiver by the company of its claim for a refund of the $700 theretofore paid plaintiff. Plaintiff released and discharged BMA from all claims, present or future, that he had or might have arising on account of the policy issued on October 22, 1947.

Plaintiff alleged and sought to prove that the release was invalid on the sole ground that there was no consideration for it; it being plaintiff's position below and here that no bona fide dispute existed between the company and plaintiff at the time of the release, and that therefore the amounts paid plaintiff (including the $700 and the $275) were indemnity payments for which the company was legally liable.

Generally, it is defendant's theory that a bona fide dispute existed based on defendant's reasonable belief in good faith at the time of the release that plaintiff misrepresented material facts when he stated in the application that he did not have arthritis, and when he failed to state that, at times during a period of about two months immediately prior to the date of the application, his fingers had cramped while he was doing critical work as a machinist; and that both the "no" answer as to arthritis and the failure to disclose prior cramping of his fingers were material misrepresentations in that they actually contributed to plaintiff's disability resulting from the November 1947 accident. This latter, because, defendant says, the low back injury was superimposed on a pre-existing arthritic [624] condition in plaintiff's spine, and that the answer "yes" to the arthritis question would have disclosed the arthritic spine, and that a disclosure of the fact of the prior cramping of his fingers would have caused defendant to make further investigations which would have led to defendant's discovery of the arthritic condition in plaintiff's spine. And defendant contends that it had information at the time of the release which caused it reasonably and in good faith to believe that there was no liability under its policy based upon information which caused it reasonably and in good faith to believe that plaintiff had made material misrepresentations in the application, and that, therefore, there was a good consideration for the release.

The present posture of the case is such that the sole issue (on the question of defendant's contention that a verdict should have been directed) concerns the validity of the release. That is to say, in so far as the issues on submissibility are concerned we may take it as

established that but for the release plaintiff was entitled to the monthly indemnities from the date of injury to the date of trial.

Plaintiff had the burden to prove the release invalid where, as here, the execution of the release was admitted. Plaintiff discharged that burden, prima facie, when he adduced evidence tending to show that he did not make, in law, fraudulent, material misrepresentations in the application. (We deem it unnecessary to relate plaintiff's evidence, because, as we understand, defendant does not contend that plaintiff failed to make a prima facie case as to the invalidity of the release.) Foster v. Aetna Life Ins. Co. of Hartford, Conn., 352 Mo. 166, 174[2], 176 S.W.2d 482, 485[4, 5]. The burden of going forward with evidence sustaining the validity of the release (not the burden of proof) shifted to defendant. Foster v. Aetna, supra, 176 S.W. 2d 485[6-8]. Defendant sought to discharge that burden by adducing positive and unequivocal proof that the only information in its possession at the time of the release, and the sole reason it denied liability under its policy at the time of the release, was the hospital letter. That letter was, of course, documentary evidence in the broad sense of that term. 32 C.J.S., Evidence, § 623, p. 475. And it is a broadly stated general rule that the construction of an unambiguous written instrument is a matter for the court. 88 C.J.S., Trial, § 217, p. 499. In the Foster case, supra, the "documentary evidence" referred to (176 S.W. 2d 486[9]) consisted of "the notice of injury; the statement of Dr. Gundlach, the attending physician; the hospital record; and the coroner's report with a statement and opinion of Dr. Gundlach attached to it." In the Foster case we said, with reference to the aforedescribed documentary evidence (176 S.W. 2d 486[9]); "The interpretation of such evidence was for the court and, if it was such as might cause an honest doubt in the minds of reasonable men as to whether insured died from disease or accident, there was a basis for compromise and the court should have given a peremptory instruction for the defendant." Now, without conceding that in our present case the hospital letter (relevant, not to prove the truth of the statements therein, but to prove what information defendant had at the time of the release) did not in its ultimate effect involve a mixed question of law and fact, nevertheless, we do agree that it was for the trial court, at least in the first instance, to construe the legal effect of the letter. And in the circumstances of this case, we need go no farther.

So that the question in the instant case must be, whether the information in the hospital letter, viewed in the light of the application, was such that the trial court should have declared as a matter of law that the fact that defendant had obtained and had in its possession the hospital letter was a reasonable investigation by which defendant had ascertained facts or evidence which would have caused a reasonable person to believe in good faith that plaintiff's statement in the

application that he did not have arthritis, and that his failure to have disclosed in the application that his fingers had cramped at times while on his machinist [625] job (in answer to any of the questions 1, 2, or 4, supra) amounted in law to fraudulent, material misrepresentations.

It is apparent that the information contained in the hospital letter is decisive on the submissibility issue as here presented. But before setting forth and discussing the contents of the hospital letter, the nature of the policy, in so far as it relates to statements in the application, should be examined.

The policy contained no sound health provision; that is, no provision making the effectiveness of the policy depend upon whether plaintiff was in fact in sound health at the time it was issued. Equally important is the fact that the policy contained no provision making plaintiff's answers to the questions in the application, warranties. Nor was there any provision in the policy conditioning its existence upon the truth of the representations or providing that the falsity in fact of any representation would avoid the policy. On the contrary, the policy specifically provided (question 35, supra) that plaintiff *represented* that each of the answers were true and complete.

"The rule in this state, as we understand it, is that where material representations made in an application for a policy of life insurance are warranted to be true, or the policy is conditioned upon the truth of the representations, or provides that the falsity of the representations shall avoid the policy, then the representations, if in fact untrue, will avoid the policy, though the representations were innocently made. This is so because such is the contract. The insurer is entitled to stand on the contract as written, and the innocence of the insured in making the representations is a matter of no concern. But where there is no such warranty or provision in the policy a misrepresentation, in order to avoid the policy must have been fraudulently made. This is the rule applicable to contracts generally, and we see no reason why an exception should be made with respect to insurance contracts. * * *

"Defendant invokes the rule, announced in the decisions, that the statute, section 5732, R.S. 1929, Mo. St. Ann. § 5732, p. 4373 [RSMo 1949, § 376.580, V.A.M.S.], providing that no misrepresentations made in obtaining or securing a policy of life insurance shall be deemed material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, applies alike to warranties and representations, and draws no distinction between innocent and fraudulent misrepresentations. We are unable to see how this rule helps defendant. Obviously, the statute does not disturb the law of insurance contracts except in that it avoids defenses founded on misrepresentations when the matter misrepresented does not contribute to the contingency or event on which the policy is to become due and payable. The purpose of the statute is to aid, not to hinder, the in-

sured—to limit, not to extend, the righs of the insurer.'' Houston v. Metropolitan Life Ins. Co., 232 Mo. App. 195, 205, 97 S.W. 2d 856, 860.

█ And other well-settled applicable legal principles are: That if at the time of the release there existed a bona fide controversy between plaintiff and defendant concerning defendant's legal liability, then the payments to plaintiff constituted a good consideration for the release, otherwise not. Foster v. Aetna, supra, 176 S.W. 2d 485[2]; and that the bona fide controversy must have existed at the time of the release based upon information in defendant's possession *at that time* in order for the payments recited in the release to have constituted good consideration. Foster v. Aetna, supra, 176 S.W. 2d 485[3].

█ In the light of the foregoing applicable law, we may more precisely state our exact question: Did the hospital letter contain information which, as a matter of law, could have caused Weaverling to have believed, reasonably and in good faith, either that plaintiff knew or should have known that he had arthritis at the time he executed the application, or that plaintiff knew or [626] should have known that his failure to include in his answer to any question the fact that his fingers had theretofore cramped while he was performing machinist's duties, was a concealment of material information called for by any questions and, if so, whether such concealment was of a matter which ''actually contributed'' to plaintiff's low back injury?

The hospital letter was:

''This is with reference to your letter of July 7, 1948 concerning Mr. John P. Dixon.

''Mr. Dixon, a machinist employed by the Missouri Pacific Railroad Company at Kansas City, Missouri, residing at 3544 Wabash Avenue, Kansas City, Missouri, was first admitted to this hospital on September 16 and discharged on September 24, 1947.

''On admission he was complaining of pain and contraction of his fingers after about two hours of work. He stated that the condition had existed since July 1947 and that he had no previous attack. He said that about two months prior to admission while doing some critical work on his job he noticed that the first two fingers and the thumb of both hands would cramp up during work. This was accompanied by a tingling on the dorsal surface of the forearm. These spells at first occurred from one to three times a week but had increased to nearly every day or more than once a day. He said they did not occur outside of his job. When the attacks came on he would stop work for five to ten minutes and then could continue with his job. He had also noticed cramping of his legs in his sleep, momentarily, but said it did not feel like the condition of his hands. There had never been any fainting.

''The patient was seen by the consulting neurologist who found that a neuro-physical examination was negative for objective evidence of organic neuro-defect.

"Roentgenograms of the thoracic spine showed increased kyphosis of the mid-thoracic region. There were hypertrophic changes of the bodies of the thoracic vertebrae, especially of the middle and lower thoracic region, due to spondylitis. There was a slight decrease in the supero-inferior diameter of the anterior portion of the bodies of several of the mid- and lower thoracic vertebrae thought to be secondary to the increased kyphosis.

"X-rays of the right upper bicuspid and molar regions showed root fragments in what appeared to be the first molar area around which there was irritation or infection. These were removed while he was in the hospital.

"Laboratory work showed a blood count of 4,340,000 R.B.C. 13 gm. hemoglobin, 13,200 W.B.C., and a differential count of 68 segs., 29 small lymphs., and 3 monocytes. Malaria smear was negative, blood Kahn negative. Icteric index on September 24 was 10. Urinalysis was negative for albumin and sugar. Blood calcium was 10.

"The patient was treated with salicylates while in the hospital and was discharged on salicylates and bromides with a final diagnosis of occupational neurosis and hypertrophic arthritis of the spine.

"Mr. Dixon was re-admitted to this hospital on April 10 and discharged on April 20, 1948. At the time of admission he stated that he was injured on November 18, 1947 while working at Kansas City, Missouri. He said that he was pulling on a draw bar and developed severe pain in his back. He had been reporting to his local physician in Kansas City where he was also examined by the consulting orthopedic surgeon on our Kansas City staff. We received a report from the consulting orthopedic surgeon dated December 3, 1947 in which he stated that he was of the opinion that Mr. Dixon may have suffered a fracture of the left transverse process of the third lumbar vertebra while lifting. However, our x-ray examination did not reveal a fracture of the left transverse process of the third lumbar vertebra.

"Mr. Dixon complained of pain in the lumbosacral region of his back. Motions of the back were painful in the lumbosacral region, but there was no deformity of the [627] lumbar region. There was a slight hunchback condition of the upper thoracic spine, which condition was present when he was a patient in this hospital in September 1947, but it was not a factor in his disability in April 1948.

"Neurological examination was negative for organic neuropathology. X-ray examination of the lumbar spine, sacrum, and sacroiliac joints showed slight scoliosis of the lumbosacral region, convexity toward the left. There was no evidence of fracture, dislocation, or bone injury. There was a calcification in the region of the abdominal aorta, which condition was not a factor in his disability of April 1948 and was not due to injury.

"X-ray examination of the cervical spine showed hypertrophic changes of the bodies of the 2, 3, 4, 5, 6, and 7th cervical vertebrae due

to chronic arthritis. There was a slight decrease in the supero-inferior diameter of the anterior portion of the body of the 5th cervical vertebra, probably developmental in nature. There was a scoliosis of the lower cervical and upper thoracic spine, with convexity toward the left.

"It was our opinion that Mr. Dixon had suffered a low back strain on November 18, 1947 while pulling and lifting with his back in an awkward position. There was a superimposed pre-exisiting arthritis of the cervical, thoracic, and lumbar spines.

"We found no evidence of fracture of the cervical, thoracic, or lumbar spine, but the consulting orthopedic surgeon, in Kansas City, was of the opinion that he may have suffered a fracture of the left transverse process of the third lumbar vertebra from muscle pull. However, we were unable to observe a fracture of the left transverse process of the third lumbar vertebra.

"Mr. Dixon was discharged from the hospital on April 20, 1948 and was advised to report to his local physician for further observation and treatment. It was our opinion that he would be disabled for two or three months from the date of discharge."

It will be observed that the hospital letter dealt with the two hospitalizations of plaintiff. As to the first hospitalization, only the fifth and eighth paragraphs dealt with anything relating to arthritis. Giving those paragraphs their most favorable construction from defendant's standpoint, all that they disclosed was that X-rays were taken of the thoracic spine which showed evidence of hypertrophic arthritis and that, when discharged, there was a diagnosis of hypertrophic arthritis of the spine. The remainder of the letter, dealing with the second hospitalization, discloses (in so far as it relates to matter pertaining to arthritis) that an X-ray of the cervical spine showed hypertrophic changes of the bodies of the 2nd, 3rd, 4th, 5th, 6th, and 7th cervical vertebrae due to chronic arthritis, and that the low back strain suffered by plaintiff on November 18, 1947, was superimposed upon a pre-existing arthritis of the entire spine.

It must be remembered that the second hospitalization did not occur until after the application for the second policy had been executed by plaintiff. Thus defendant was bound to know that nothing contained in the letter as to the April 19, 1948, hospitalization could have related to plaintiff's knowledge at the time of the application unless something stated in the portion dealing with the second hospitalization made it clear that plaintiff's statements in the application were knowingly false. But irrespective of this and considering the entire letter, there is nothing in it which a trial court could say, as a matter of law, would cause a reasonable layman to believe in good faith that plaintiff knew or should have known at the time he executed the application that he had arthritis in his spine. This, because there was nothing in the hospital letter which should have caused Weaverling to believe that the

hospital had disclosed to plaintiff the result of any of the X-rays or the diagnoses made. At best, all that it would appear reasonable to conclude from the information in the hospital letter pertaining to arthritis, was that there was a *possibility* that plaintiff, in some not **[628]** apparent manner, had gained some knowledge of an arthritic condition in his spine during or subsequent to his first hospitalization and prior to the time he executed the application. Even this *possibility* would need to be based on the inferences that plaintiff must have known that some portion of his back had been X-rayed and, therefore, must have inquired as to what the X-ray disclosed, or must have examined his hospital record, or must have been told what the X-rays disclosed or what the diagnosis was. Such inferences, even if possible, are not, on the face of the letter, reasonable. And even if it be assumed that the diagnosis was made known to plaintiff, still it would be necessary to reject the further inference that, in connection with such disclosure, plaintiff was not also told that the condition found in his spine was a normal condition for one of his age, generally described as hypertrophic arthritis, but not amounting to the infectious disease known as arthritis. In any event, it is apparent that probably the most reasonable conclusion from the portion of the letter pertaining to arthritis was that, unless plaintiff had had some active back trouble prior to the time of his hospitalization (and Weaverling did not profess to so believe because of the hospital letter, and plaintiff's testimony was to the contrary), plaintiff, like any other layman, would not have known that he had arthritis and therefore honestly would have said in his application that he had no arthritis.

The paragraphs of the hospital letter which pertained to the cramping of the fingers, at least from a layman's standpoint, are paragraphs 3 and 8. Certainly, by reason of paragraph 3, Weaverling was justified in believing that plaintiff *knew* that, between some time in July 1947 and September 16, 1947, he had had pain and contraction in the fingers after two hours of critical work as a machinist, causing the first two fingers and thumb of each hand to cramp and a tingling on the dorsal surface of his forearm; and that this cramping did not occur outside the job but had increased in frequency to almost every day and sometimes more than once a day. The difficulty with defendant's position on this aspect of the matter is that paragraph 8 of the hospital letter demonstrated to a reasonable person that upon examination this condition had been diagnosed as "occupational neurosis." Now Weaverling had only the hospital letter and relied upon it. Thus it is apparent that if he did not know and did not learn the meaning of "occupational neurosis", then he had no reasonable basis for believing that plaintiff's failure to have disclosed this cramping of the fingers in the application amounted to an intentional concealment of a matter called for by either question 1, 2, or 4, supra, or that the undisclosed condition of the fingers was a matter which "actually contributed" to plain-

tiff's low back injury, or that such a disclosure would have led to the discovery of any condition which did "actually contribute" to the low back injury.

If, on the contrary, Weaverling knew or had ascertained the meaning of "occupational neurosis" he would have known or discovered that it is: "(a) One in which the occupation of the individual appears to be the precipitating cause. (b) A disorder affecting groups of muscles used in the performance of special movements." Blakiston's New Gould Medical Dictionary, 1st Ed., p. 668. In that event, he would have relied upon the diagnosis and thus, based solely on the hospital letter, should have known that the condition of plaintiff's hands most likely did not "actually contribute" to plaintiff's low back injury sustained in November 1947, and should have known that disclosure of the cramping of the fingers would not inevitably have led to the discovery of an arthritic condition in plaintiff's spine.

And we find nothing in the hospital letter pertaining to the second hospitalization which would have caused a layman, in view of the prior diagnosis of occupational neurosis, to have believed reasonably and in good faith, that there was any causal connection between the chronic arthritis of the cervical spine and the cramping of the fingers; nor would the letter have clearly [629] indicated that the disclosure, in the application, of the cramping of the fingers would have led to the discovery of hypertrophic arthritis of the spine. The fact that at the trial defendant adduced a medical opinion that there *could* be some connection between the arthritis in the cervical spine and the cramping of the fingers, is not important on the present issue, in view of Weaverling's testimony that he had only the hospital letter and relied solely upon it, and in the absence of evidence that Weaverling obtained this medical opinion prior to the denial of liability and the taking of the release.

Furthermore, while Weaverling's testimony may not have been conclusive against defendant as to what a reasonable person in good faith could have believed from examining the hospital letter, still portions of his testimony as to the effect of the hospital letter on him are significant. He testified: "Q This so-called summary of the hospital record upon which you cut him off, Mr. Weaverling, does that contain any fact that indicates that Dixon knew that he had arthritis at the time he made his application? A No. Q Did you at the time you cut him off on the basis of that summary or anything else have any information that indicated that Dixon was acting in any way other than honestly and in good faith at the time he told your man Mais [the agent who took the application] I have never had arthritis? A No. * * * Q And has anybody ever told you, anybody ever said to you, any doctor that has treated him or seen him or any doctor that X-rayed him in the Missouri Pacific Hospital, have they ever told you that they told this poor man that he had arthritis? A No. * * * Q

So at the time you cut him off, as far as what he knew you didn't have any evidence to support the fact that he knew when he signed this application that he was making false or fraudulent answers, that is the fact, isn't it? A Yes.''

After a careful consideration of the hospital letter, together with the questions and answers in the application, and bearing in mind that Weaverling had open to him the means by which he could have resolved any possible questions suggested by the letter, we are of the opinion that, at best, the effect of the hospital letter was to have caused a reasonable person to have made further investigation to have ascertained further facts or information.

We conclude, therefore, that the trial court did not err in refusing to declare as a matter of law that the obtaining of the hospital letter constituted a reasonable investigation from which evidence or information was obtained that could have caused a reasonable person in good faith to have believed, solely on the basis of the hospital letter, that plaintiff had knowingly misrepresented any matter which contributed to plaintiff's November 1947 low back injury.

■ Defendant contends that the trial court erred in submitting the question of penalties. Section 375.420 RSMo 1949, V.A.M.S., provides in effect that when it appears at the trial of an action that an insurance company has vexatiously refused to pay a loss under its insurance contract, the jury may allow plaintiff damages not to exceed ten per cent of the amount of the loss and a reasonable attorney's fee.

Defendant points out that the present action was not instituted until nearly three years after it had obtained the release, valid on its face, executed by plaintiff with the advice and approval of his counsel, and that there was no substantial evidence of any express demand for payment prior to the institution of this action. And, as defendant also points out, the general rule is that ''vexatious refusal to pay contemplated by the statute 'Is not to be deduced from the mere fact that upon suit the verdict is adverse to the defendant.' * * * The word 'vexatiously,' as used in the statute, has been defined by the decisions of this court to mean without reasonable, or probable, cause or excuse.'' Camdenton [630] Consolidated School Dist. v. New York Cas. Co., 340 Mo. 1070, 1092, 104 S.W. 2d 319, 331[10]. And it is further true that the question of whether there was a bona fide dispute is determined on the basis of information in defendant's possession at the *time of taking the release,* while the question as to whether statutory penalties may be assessed depends upon *all the evidence* adduced at the trial of the action.

The filing of the action was a demand for payment and defendant refused payment by denying liability on the ground that plaintiff had released it of all claims. The real issue tried and the only issue submitted by defendant was the validity of the release upon which defendant relied solely as a defense. And defendant offered no sub-

stantial evidence at the trial in an effort to support the hypothesis that, even if there was not a bona fide dispute at the time of the release, there was a bona fide dispute at trial time because of facts developed after the release and before trial. On the sole defense submitted, the jury found, in effect, that defendant had not ascertained facts or information at release time which could have caused a reasonable person to believe, in good faith, that there was no liability.

Under these circumstances, we must hold that the trial court did not err in submitting to the jury the issue of damages for vexatious refusal to pay.

Defendant contends that the court erred in giving instruction 1 on behalf of plaintiff because "(a) It contains abstract statements of law and attempts to shift the burden of proof; (b) It contains sundry assumptions and arguments; (c) It includes elements which there was no substantial evidence to support; and ignores uncontradicted facts; (d) It submits issues of law to the jury; (e) It ignores vital issues and defenses; (f) It is so long, confusing and prejudicial as to require reversal."

As to (f). There is no doubt that the instruction is long. It occupies more than four pages of the typewritten transcript and about three pages of plaintiff's brief. However, we cannot agree that its length alone caused this particular instruction to be confusing or misleading. While it is one instruction in the sense that it all follows the number "1", yet in fact it deals with three distinct subjects, viz., an abstract statement of the applicable law, the validity of the release, and liability under the policy if the release is invalid. These three subjects are set forth separately and understandably.

As to (a). There is no doubt that the instruction does contain two paragraphs which set forth abstractly certain applicable principles of law. But the application of these principles to the fact issues is later made apparent. Abstract instructions are usually condemned when they are not related to the fact issues. There is no claim made that the abstract statements of law were not correct, except in one respect; viz., that the abstract statements "attempt to shift the burden of proof." This contention is stated by defendant as: "the first paragraph of this instruction, very plainly says that a 'purported' release taken under assumed circumstances is not binding, clearly implying that the burden is on defendant to *uphold* the release here." We think the contention is untenable in view of the facts that the first paragraph, using the words "purported release", was an abstract statement, nondirectory in nature, and that defendant's instruction B (on the burden of proof) made it abundantly clear that defendant was entitled to a verdict unless plaintiff had sustained his burden to prove that the release was obtained "without any consideration."

As to (b). The claim is that the instruction contains "assumptions and arguments." Defendant lists 11 expressions in the instruction

which are claimed to be argumentative. A reasonable limit on the length of this opinion makes it not feasible to discuss each of these specified expressions separately. Suffice to say that we have examined the instruction in the light of these claims. We are of the opinion that, while some of the wording of the instruction [631] is such that it is somewhat argumentative, the instruction, read in its entirety, is not reversibly erroneous for that reason.

Defendant also says that the instruction assumes certain facts. Two of the alleged "assumptions" occur in the abstract statement of law and not in the directive portion of the instruction. We cannot agree that the directive portion of the instruction unwarrantedly makes the assumptions charged.

As to (c)—that the instruction "includes elements which there was no substantial evidence to support; and ignores uncontradicted facts." Defendant says this language of the instruction submits or "asserts" facts not supported by the evidence: "And if you further find that any reasonable investigation by the defendant * * * would and should have disclosed that the said condition of plaintiff's hands * * * was in no way related to or connected with any condition in his spine or his later back disability * * *." Plaintiff's medical witness testified positively that there was no connection between the cramping of plaintiff's hands and the arthritic condition in the spine or the subsequent back injury. And the jury reasonably could have found that "any reasonable" investigation would have so shown.

Defendant further says that the instruction eliminated the question of plaintiff's attorney's advice as it bore upon the question of good faith or upon plaintiff's knowledge of the contentions of defendant at the time of the release. The question on the validity of the release, under the circumstances of this case, did not depend upon plaintiff's knowledge of defendant's contentions, nor, as we see it, was it necessary to submit the facts as to plaintiff's attorney's advice. The essential question was whether there was a bona fide controversy which, in turn, depended upon the information defendant had at the time of taking the release. The facts as to plaintiff's attorney's advice was not an essential element of plaintiff's case, and defendant did not submit, or seek to offer, an instruction containing the alleged omission on any theory bearing on the bona fide dispute question.

As to (d)—that the instruction submits issues of law to the jury. Defendant claims that the "proper construction of the letter from the Missouri Pacific Hospital" was erroneously submitted to the jury as such was a law question for the court. We have heretofore referred to the question as to whether the construction of the hospital letter was purely a matter of law for the court. We found it unnecessary, in the present status of the case, to decide that question. In so far as the instruction is concerned, we are of the opinion that defendant is in no position to complain on the ground that the effect of the hospital letter

on a reasonable person was submitted to the jury. This, because defendant by its instruction A joined in that submission. Instruction A said in part that: "* * * if you find * * * that * *-* before the date of the written release * * * defendant was claiming and contending that plaintiff was not entitled to such indemnity * * * upon the ground that defendant had information from the St. Louis hospital * * * that prior to the issuance of said policy plaintiff had certain occupational and diseased conditions of his hands and back which were not disclosed * * * and * * * that defendant on or before the date of said release had reasonable ground to believe and did believe said information, in good faith on substantial grounds, * * *." In view of defendant's positive evidence that the only "reasonable ground" for the belief hypothesized was the hospital letter, defendant joined in the submission to the jury of the letter's effect upon its agent, Weaverling.

As to (e)—that the instruction ignores vital issues and defenses. In this respect, defendant says that the instruction ignored the material facts that, had plaintiff disclosed in the application the prior cramping of his hands, defendant would have secured the complete Missouri Pacific Hospital record, would have thereby discovered [632] the arthritic condition in plaintiff's spine, and would not have issued the policy. As we understand it, defendant means that because defendant adduced oral testimony to the effect that, if defendant had known at the time of the application that plaintiff's hands had theretofore cramped while on the job, defendant would have made an investigation and would have obtained the facts which, defendant says, would have included the hospital report showing the arthritis in the spine. Now, as we view it, this was a theory advanced by defendant, and supported by defendant's oral testimony, by and from which the jury could find that the failure to disclose the condition of the hands actually contributed to the disability in the lower back claimed by plaintiff.

Plaintiff's instruction 1 did require the jury to find that the cramping of plaintiff's hands "did not contribute * * * to the disability in plaintiff's spine and back, * * * which resulted from an accident * * * on November 18, 1947." It is true that this language does not submit the evidentiary basis of defendant's theory, in that it does not require an affirmative finding by the jury that the disclosure of the hands' condition would not have led to discovery of the arthritis in the back. But the language used did require the jury to make a general finding that the condition of the hands did not in fact contribute, which includes within it the negative of defendant's stated theory of defense.

Defendant would be in a better position to urge its present contention were it not for the fact that by instruction A it also submitted only a general finding that the undisclosed cramping of the hands *did* contribute to plaintiff's later disability. Instruction A, like plaintiff's instruction 1, does not hypothesize defendant's evidence of the manner

in which the failure to disclose did contribute. The language of defendant's instruction A in this respect is: "and if you find that said undisclosed or misstated information [referring in part to the condition of plaintiff's hands] contributed to the disability later claimed by plaintiff".

Thus we conclude that plaintiff's failure, under the circumstances, to have hypothesized defendant's evidence which supported its theory of "contribution" and to have required a negative finding on it, did not constitute an omission from the verdict-directing instruction of an essential element of plaintiff's case on the question of the validity of the release.

Defendant also contends that the trial court erred in failing to discharge the jury and in failing to reprimand plaintiff's counsel because of his alleged misconduct which, defendant says, was "cumulative and highly prejudicial in effect". Defendant points to some 18 incidents in the transcript to support its contentions. We deem it unnecessary to detail these. We have examined all of them. If our count is correct, in 12 of them defendant's counsel made an objection to a remark of, or in most instances to a question by, plaintiff's counsel. In each of the 12, the objection was sustained and defendant's counsel asked for no further relief. In two of the instances, the objection of defendant's counsel to plaintiff's counsel's question or remark was sustained and, on request, the trial court instructed the jury to disregard the question or the remark. In two of the instances, no objection of any kind was made. In one instance, an objection was sustained on the ground that a question asked was argumentative. Upon request of defendant's counsel to reprimand plaintiff's counsel for repeatedly asking argumentative questions, the court said to plaintiff's counsel, "Avoid the argument, Mr. Field." In the remaining instance, after an objection had been sustained to a question on the ground that it was argumentative, defendant's counsel, out of the hearing of the jury, moved that plaintiff's counsel be reprimanded for repeatedly asking argumentative questions. The court told plaintiff's counsel to refrain from asking argumentative questions and expressed the hope that he would not be forced to reprimand counsel in the presence of the jury. [633] Whereupon, defendant's counsel's motion to discharge the jury was overruled.

The record before us reflecting the alleged misconduct as set forth above, demonstrates that the only question before us for review is whether the trial court abused its discretion in failing to discharge the jury in the last instance noted. Clearly, the trial court did not abuse its discretion.

We may observe with reference to the cited incidents in which the court either granted the relief requested or in which there was no objection made, that most of them occurred during the cross-examination by plaintiff's counsel of defendant's witnesses. And while it is true,

as the court recognized by his correct separate rulings, that the questions were argumentative in form, still we could not hold, in view of the fact that the trial court overruled defendant's motion for new trial in which the trial court was charged with error in refusing to reprimand counsel and to declare a mistrial because of them, that these trial incidents, separately or in cumulative effect, prevented defendant from receiving a fair trial.

The judgment is affirmed.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the Court en Banc. *Dalton, Hollingsworth, Westhues, JJ.*, and *Matthes*, Special Judge, concur; *Hyde, J.*, dissents in separate opinion; *Storckman, J.*, dissents and concurs in dissenting opinion of *Hyde, J.; Eager, J.*, not sitting. *Leedy, C.J.*, dissents and concurs in separate dissenting opinion of *Hyde, J.*

HYDE, J. (dissenting).—I respectfully dissent and adopt as my dissent the dissenting memorandum of Commissioner Lozier in Division No. One, as follows:

I am unable to concur in Commissioner Coil's opinion. It is clear, from the opinion, that if securing the hospital letter alone constituted "reasonable investigation" which gave defendant information which could have caused a reasonable man to believe in good faith that there was no liability under the policy, defendant was entitled to a directed verdict. It is my view that Weaverling reasonably could have believed, after examination of the hospital letter alone, that plaintiff knew or should have known that he had some type of arthritis. This, because the letter stated that a final diagnosis, at the time of plaintiff's first release from the hospital, was "hypertrophic arthritis." It seems to me that it was perfectly reasonable for Weaverling to infer that this final diagnosis had been communicated to plaintiff prior to his release. If such was a reasonable inference, then it was also reasonable for Weaverling to believe in good faith: (1) That plaintiff was aware of this "hypertrophic arthritis" condition when he executed the application; and (2) that the "hypertrophic arthritis" condition did actually contribute to plaintiff's disability. The latter, because the hospital letter stated that the low back injury was superimposed upon a pre-existing arthritic condition of the spine.

*Leedy, C.J.*, and *Storckman, J.*, concur.