**MOUND CITY TOBACCO COMPANY,
a corporation, Plaintiff,**

v.

**MARYLAND CASUALTY COMPANY,
a corporation, Defendant.**

No. 67C92(1).

United States District Court
E. D. Missouri,
E. D.

Aug. 1, 1968.

Byron A. Roche, Murphy & Roche, St. Louis, Mo., for plaintiff.

John S. Marsalek, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

HARPER, Chief Judge.

This is an action on an insurance policy tried before the court. The defendant is a foreign insurance company and the plaintiff is a tobacco products distributor incorporated in Missouri, with its place of business in St. Louis, Missouri. Plaintiff is suing on a Comprehensive Dishonesty, Disappearance and Destruction Policy ("3D" policy) issued by defendant, which is asserted to provide coverage for a robbery of plaintiff's premises which occurred on October 6, 1966. There is no dispute as to the amount of the loss, which is $34,434.66. Plaintiff also claims a penalty for vexatious refusal to pay and attorney's fees.

While certain factual matters are subject to dispute, the parties are in agreement with respect to most of the factual background and all of the immediate circumstances of the robbery. The policy in question became effective on August 29, 1961, and was renewed thereafter annually by the payment of the next year's premium. The address of the plaintiff's premises covered by the policy was changed by endorsement in 1963, the new address being on Monroe Street. On July 25, 1966, the roof of the Monroe Street premises partially collapsed, making the building dangerous to employees and causing it to be without an operative burglar alarm system such as had been maintained theretofore (apparently at both locations). Plaintiff

immediately contacted a watchman service to guard the premises after business hours. It also contacted defendant's agent and inspections were made of the premises by employees of the defendant. Defendant provided plaintiff with its Workmen's Compensation and Public Liability insurance in addition to the "3D" coverage, and the result of the inspections was cancelation of these policies as of August 26, 1966. Both of these policies were due to expire on August 29, 1966, which was also the renewal date of the "3D" policy. New Workmen's Compensation and Public Liability policies which had already been written and which were to become effective August 29, were not cancelled and the "3D" policy was duly renewed. The testimony indicates that the reason the new policies were allowed to go into effect such a short time after the old ones were cancelled was that plaintiff agreed to move to a new location in order to avoid the unsafe conditions at the Monroe premises. In any event, the result of the defendant's inspection was that plaintiff was without Workmen's Compensation and Public Liability coverage for three days but its "3D" policy remained continuously in force.

The relocation of plaintiff's business was effected promptly, new premises on Brannon Avenue being occupied on September 10, 1966. An endorsement was again added to the policy to make it applicable to the new location. There was no operative alarm system at the Brannon property, but plaintiff immediately contacted the company which had previously supplied it with such equipment and an agreement with respect to installation of a new system was entered into in late September. The installation, however, was not completed until late November.

The robbery occurred several hours after midnight on October 6th. A watchman who had been used at the two locations continuously since the middle of August, James Pratt, was on duty inside the building. He received two telephone calls which caused him to become concerned, there being no response when he lifted the receiver, and after the second such call he decided to check the outside of the building. While walking around the side of the building he was approached from the rear, a hard object resembling a gun was placed against his back, and he was made to unlock the front door. Inside the premises the robbers handcuffed him to a table and made off with two truckloads of cigarettes.

The chief problem of this case arises from the fact that Pratt was initially threatened with violence outside of the plaintiff's building. Plaintiff admits that the only policy provision which might be applicable to this loss is an endorsement adding certain burglary and robbery coverage as Insuring Agreement VII. The coverage afforded is for "Loss by Burglary or by Robbery of a Watchman, while the Premises are not open for business, of merchandise * * * within the Premises * * *" On the back of the endorsement are certain "Special Agreements" which include the following definitions:

"'*Premises*' means the interior of that portion of any building at a location designated in the Schedule * * *

"* * *

"'*Robbery of a Watchman*' means the taking of insured property by violence or threat of violence inflicted upon a private watchman employed exclusively by the insured and while such watchman is on duty within the Premises."

Defendant contends that Pratt was not "on duty within the premises" at the time applicable for coverage. It reasons that the robbery as such event is defined in the policy commenced when Pratt was accosted while walking around the building and that thereafter when he re-entered the building he was not on duty since he was then plainly under the robbers' control.

In support of its position defendant cites a number of cases from jurisdic-

tions other than Missouri involving more or less similar situations and tending to support the proposition that a watchman or employee is not on duty or does not have care and custody of property when he is under the control of robbers. H. & S. Pogue Co. v. Fidelity & Casualty Co., 299 F. 243 (6th Cir. 1924); A. J. Bayless Markets v. Ohio Casualty Ins. Co., 55 Ariz. 530, 104 P.2d 145 (1940); Great American Indemnity Co. v. Southern Feed Stores, 51 Ga.App. 591, 181 S.E. 115 (1935); Milkes v. U. S. Fidelity & Guaranty Co., 257 Ill.App. 65 (1930); Boesky Bros. Twelfth St. Corp. v. U. S. Fidelity & Guaranty Co., 267 Mich. 628, 255 N.W. 307 (1934); Shannon Furniture Co. v. Federal Surety Co., 159 Okl. 205, 15 P.2d 22 (1932). None of these cases involved the enticement of a watchman out of the building, and taken as a whole they are factually remote from the present case.

In the *Pogue* case the policy afforded protection when two or more persons were on duty within the premises, but when the robbery commenced there was only one watchman present. The court refused to find compliance with the conditions for coverage on account of the failure to keep two adult persons on the premises at all times as the policy provided, even though two hours later while the robbery was still in progress a second watchman stopped by to leave his coat on the way to a movie.

Similarly, in the *Milkes* case no recovery was allowed when an employee was taken into custody while on his way to work and about to enter the building, which had been left unattended for about one-half hour after the end of the business day.

The *Shannon, Bayless* and *Boesky* cases all involved policy requirements for a custodian to be on duty, and in each a manager or similar employee was taken into custody after the premises had been closed and left unattended for the night. In *Shannon* the employee had walked to his car a block away; in *Bayless* he was enticed from his home by a telephone call; and in *Boesky* he was alighting from his car at his home.

The *Great American* case is somewhat closer to the present case in that a watchman was on duty at the pertinent time, but he was outside when accosted because he had decided to spend the night out-of-doors since the air was cooler, and he had locked the doors behind him with no intention of going back into the building that night.

These cases support no more specific a rule than that the courts will not indiscriminately hold that mere presence within a building sometime in the course of a robbery is sufficient to meet a "care and custody" or "on duty" requirement. Here there is no question that Pratt was on duty in the proper place before he was enticed outside. His brief departure from the premises was undoubtedly motivated by a decision that this was the best means available for protecting the plaintiff's property under the circumstances. There was no showing that it was unwise to adopt the response he did to the suspicious phone calls—that it increased the risk. Thus defendant's effort to defeat coverage in this situation finds no support in events indicating a failure of due precaution, and it is supported only in the most technical sense by an absence of conditions in strict conformity with the stated coverage. Moreover, other non-Missouri decisions have permitted recovery where a considerably greater gulf existed between the facts and precise conformity with a care and custody clause. J. J. Newberry Co. v. Continental Casualty Co., 229 Cal. App.2d 728, 40 Cal.Rptr. 509 (1964); Fee v. Zurich General Accident & Liability Ins. Co., 257 Ill.App. 227 (1929); Fox West Coast Theatres v. Union Indemnity Co., 167 Wash. 319, 9 P.2d 78 (1932).

However, the concern here is Missouri law, and while there are no Missouri cases dealing with a similar problem respecting the location of a watchman, there is one which presents a helpful analogy. In Bank of Conception v.

American Bonding Co., 230 Mo.App. 54, 89 S.W.2d 554 (1935), reduced coverage was applicable under the policy involved if the insured's vault was not locked by time lock at the beginning of a robbery. The robbers entered the bank at about four o'clock in the morning and waited until shortly after nine o'clock when the cashier came in and opened the door of the vault which was set to unlock at that hour. They then accosted her and locked her and several other hostages in the safe. The policy contained the ordinary definition of robbery: Violence inflicted upon a person having care and custody of the property or putting such person in fear of violence. The insurer argued that the "putting in fear" was the beginning of the robbery as defined, and since the vault was open at the time, the reduced coverage applied, but the court held, l. c. 559:

"Under the facts and the circumstances above set out (referred to in the record in this case), the beginning of the robbery is not to be limited to the taking place of the final act of the felonious and forcible taking of the money from the safe at the time it was taken or immediately thereafter by violence to the person of Miss Wirth, the custodian in charge thereof, or to the putting of her in fear or to any overt felonious act committed in her presence; but the beginning of the robbery was with the first act performed by the robbers in pursuance of their plan to effect the robbery and in furtherance of the accomplishment of the robbery—that is, with their act in making an unlawful entry into the bank building—and such robbery continued through the series of acts by them which followed, culminating in the completed robbery."

The court went on to note the well-established rule that a provision in an insurance policy which is susceptible of two constructions is given the interpretation most favorable to the insured.

■ Although the disputed question is one of place rather than time in the instant suit, the approach taken seems equally appropriate here. While a policy definition must necessarily focus on a few required acts or occurrences describing the crime for which coverage is provided, a particular robbery may involve a whole series of acts necessary to its completion, some of which are not contemporaneous with the putting in fear and the actual taking. If the conditions for coverage are complied with when the series of acts begins, the insured may not be guilty of contributing to the risk which they were designed to avoid even though at a later point strict compliance is not present. Thus where a watchman is stationed within the premises when he receives suspicious phone calls and he then goes outside for a brief investigation, it is not necessarily true that he has increased the risk by so doing. The court, therefore, concludes that the policy, given the liberal construction indicated under Missouri law, is broad enough to include the robbery of a watchman who is on duty within the premises at the commencement of the series of events constituting the robbery and is thereafter enticed out-of-doors.

■ Two additional defenses are raised by the insurer, one of which relates to other language in the definition of "robbery of a watchman". Defendant contends that since Pratt was a watchman supplied by an independent watchman service, from which he received his wages, he was not "a private watchman employed exclusively by the insured." The plaintiff has attempted to meet this contention with evidence that Pratt was supervised exclusively by its president, arguing that in light of such supervision and control he was at least a special employee. The court does not think that such a determination is necessary since the evident purpose of the provision is to deny coverage where only a part-time watchman—one "employed" by a number of companies—is used. It is not disputed that Pratt was a full-time watchman. If the defendant meant for some reason, which the court

is unable to guess, to impose the further requirement that the watchman be a regular employee of the insured, it was obliged to so specify in unambiguous terms.

Defendant's final defense is based on the fact that there was no operative burglar alarm in the Brannon Avenue premises when the robbery occurred. Among the provisions in the "Special Agreements" portion of the endorsement for burglary and robbery of a watchman is one denying coverage "while there is any change in the condition of the risk." The policy application executed by plaintiff, presumably before the policy was issued in 1961, contains the following statement with respect to alarm systems: "When the Premises is closed for business, the following alarm or watchman service shall be afforded * * *:" The entries in the blanks beneath show that a burglar alarm was to be maintained and there was to be no watchman.

█ It is not clear whether defendant regards this statement about a burglar alarm as a representation or a warranty, but it is quite evident that it does not constitute a defense under either theory. The policy application is termed "Application—Questionnaire", and at the top of the form there is an instruction to obtain a new such application at the beginning of each premium period. Preceding the first numbered question there is the statement: "If the Applicant will furnish the following information, the Company will be in a position to suggest a minimum amount of Fidelity coverage to be carried." Nowhere is there any express statement that the information supplied is to constitute warranties or that the application is to become part of the policy when issued. There is no mention of representations either, although of course the particular statements of the insured may be regarded as such. The policy itself

does nothing to remedy this situation since it contains no reference to the application. Moreover, the burglary and robbery endorsement involved in this suit contains its own blank space for description of alarm or watchman service to be maintained, in which there is no entry, and a provision for reduced coverage should there be a failure to maintain such service. Disregarding the effect of this omission in the endorsement itself, the statement in the application certainly cannot be regarded as a warranty, and as a representation it will not avoid the policy since the Missouri rule is that such a defense requires that the policy be conditioned on the truth of the representations or that they be fraudulent, which this one of course was not. Taylor v. Black, 258 F.Supp. 82 (E.D.Mo.1966); Dixon v. Business Men's Assurance Co., 365 Mo. 580, 285 S.W.2d 619 (1955).

█ As to the change of risk clause, it is not clear how this might enable avoidance of the policy when the defendant cannot prevail on a misrepresentation theory. It would seem that the risk in this instance is necessarily defined by the representations made in the application, or those which were not made in the endorsement, but even if defendant's position is taken and it is assumed that a change in the condition of the risk includes the status of burglar alarm systems, this defense is of no avail since there was unequivocal testimony by defendant's agent that he knew that the alarm system was out and a watchman was employed after the roof collapsed at the Monroe premises, and that he knew that a similar condition prevailed at the new Brannon premises. This was sufficient to give the insurer notice (see Gueringer v. Fidelity & Deposit Co., Mo.App., 184 S.W. 936 (1916), but it might also be noted that the agent's testimony indicates that he passed the information about the Mon-

**604**

roe premises along to defendant, and that other testimony indicates that defendant's inspectors, having gone through the Monroe premises after the collapse, were in a position to know that the alarm was probably inoperative considering the extent of the damage. The fact that the employees involved may have been unaware that the plaintiff had a "3D" policy with defendant is hardly material to the question of notice, as is the fact that defendant's underwriting file did not show that the alarm system was knocked out. The premium reduction for the alarm shown by defendant's premium computation sheets is also immaterial, especially since there was no evidence that plaintiff was aware of the reduction.

The court, therefore, holds that plaintiff is entitled to judgment for the amount of the loss, $34,434.66. It further holds that plaintiff is not entitled to damages for vexatious refusal to pay pursuant to Sec. 375.420 because it considers that defendant's refusal to pay was not without reasonable or probable cause or excuse. Dixon v. Business Men's Assurance Co., supra; Pfingsten v. Franklin Life Ins. Co., 330 S.W.2d 806 (Mo.1959).

In *Pfingsten* the court states, l. c. 817:

"The test is whether the evidence and circumstances were such as to show the insurer's refusal was willful and without reasonable cause as the facts would have appeared to a reasonable man before trial."

In view of the policy provisions and the evidence with respect to the location of the watchman at the time of the robbery, reasonable men might disagree, and so the defendant cannot be said to have acted willfully without reasonable cause in contesting liability.

This memorandum opinion is adopted as the court's findings of fact and conclusions of law and the clerk is directed to enter a judgment for the plaintiff in the sum of $34,434.66.