EDITH G. TABLER, Plaintiff in Error, v. GENERAL AMERICAN LIFE INSURANCE COMPANY, a Corporation, Defendant in Error.—117 S. W. (2d) 278.

Division One, May 26, 1938.*

*John C. Vogel* for plaintiff in error.

*NOTE: Opinion filed at September Term, 1937, April 1, 1938; motion for rehearing filed; motion overruled at May Term, 1938, May 26, 1938.

*Williams, Nelson & English, Allen May* and *R. F. O'Bryen* for defendant in error.

HYDE, C.—This is an action on an insurance policy to recover $10,000 with interest, penalty, and attorneys' fees. Defense was made that the policy had lapsed for nonpayment of premiums, and that extended insurance thereafter provided had terminated prior to the death of the insured. The case was tried before the court, with jury waived, and the court, finding against plaintiff, entered judgment discharging defendant. Plaintiff has brought the case here on writ of error.

Each party contends that it was entitled to judgment upon conceded facts. The insurance policy was issued by the Missouri State Life Insurance Company and liabilities of the company have been assumed by defendant. We, however, use the term defendant to apply to the Missouri State Life Insurance Company. The insured Harry C. Tabler died October 30, 1931. He signed an application to defendant for insurance on February 17, 1926. The date of his birth was therein stated to be September 3, 1898, so that after March 2, 1926, he would be required to pay the rate for age twenty-eight instead of the rate for age twenty-seven, applicable at the time he signed the application. His application provided: ''(2) If the first premium is not paid in cash at the time the application is made, or if a policy different from the one described in this application is issued, the insurance shall not take effect until the first premium thereon has actually been paid to and accepted by the Company, or its duly authorized agent, and the policy delivered to and accepted by me during my life and good health; but in that event the policy shall bear the date of its issuance and all future premiums shall become due on such policy date and all policy values and extended insurance shall be computed therefrom.'' The premium was not paid at the time the application was made, and the policy issued was neither described nor intended to be described in the application when Tabler signed it. The application was signed in blank as to amount and at that time

Tabler had only agreed to take one policy for $1000. However, the application was filled in to describe three policies: $5000 for the benefit of Tabler Cleaning Company; $5000 for the benefit of North End Cleaning Company, and $10,000 for the benefit of his wife, plaintiff herein. Two other policies of $10,000 each, not described in the application at all, were also issued at the same time as the ones described. Some of these were paid after Tabler's death and only the $10,000 policy, in which plaintiff was beneficiary, is herein involved.

This was an endowment policy which provided that defendant "agrees to pay Ten Thousand Dollars which is the face amount of this policy to Edith G. Tabler, wife of the insured immediately upon receipt of due proof of death of Harry C. Tabler, Jr., the insured, prior to the second day of March, 1984, which is the end of the endowment period, or the company will pay the face amount of the policy to the insured if he be living and the policy will be in full force to the end of the endowment period." It further provided that "if any premium is not actually paid when due this policy shall cease and determine," but a 31-day grace period was granted. The policy contained nonforfeiture options, including paid-up term insurance which was to become automatically effective if other options were not chosen after default. This policy ended thus: "In Witness Whereof, the Missouri State Life Insurance Company has caused this policy to be signed this Tenth day of March, 1926." (It was signed by its president, secretary, and registrar.)

This policy also contained the following provisions:

"*The Contract.* This policy and the application herefor, a copy of which is attached hereto and made a part hereof, constitute the entire contract. . . . If the age of the insured be misstated the amount payable hereunder shall be such as the premium paid would have purchased at the correct age. (Age 27 was stated) . . . This Insurance Is Granted in consideration of the application herefor and of the payment in advance of One Hundred Seventy-one and 20/100 Dollars, which is the premium for the first year's insurance under this policy for the first year's insurance under this policy ending on the Second day of March, 1927; which is term insurance, and for the legal reserve required, if any. The insurance will be continued thereafter upon the payment of the annual premium of One Hundred Seventy-one and 20/100 Dollars, on or before the Second Day of March in every year during the continuance of this policy."

This policy (with the others) was delivered to Tabler by the insurance agent, who had obtained his signature to the blank application. He said: "When I gave him the policies he was very much surprised at seeing them, and he got kind of mad about it. . . . (Q): You just walked out and left him talking to himself? A. That is it." This delivery was made some time in March, 1926, and

on March 31, a charge for the premiums was made against Tabler's account with the Insurance Agency, through which the policies were delivered. Bills were prepared on each account with the agency at the end of each month by its bookkeeper. Tabler had purchased "fire, tornado, liability and other insurance" through this agency and had "a running account" there since 1924. Some time prior to May 26, 1926, Tabler decided to keep all of the policies and paid the first annual premiums to the agent who had delivered them. On that date, this agent paid it to the Insurance Agency and two days later it was received by defendant. The agent's testimony about this was, as follows: "I saw him two or three times a week . . . and I would advance different reasons why he should take them; he just refused to take the insurance for various reasons, primarily because he thought he couldn't afford to pay for them, that it was too much insurance. It went on like that for some time until the period of time expired when I could keep them out without remitting the premium on them, that is, the net premium, and when I finally went to him and told him I either had to have the policies or be paid for them he agreed that he would take them and pay for them. . . . He paid me for the policies at the time. I paid the premiums to Lawton-Byrne-Bruner (the Insurance Agency(' within twenty-four hours after I received them."

Tabler paid four annual premiums (1926-1927-1928-1929) on the policy herein involved. He paid in cash the premium due in 1927. (He gave a note for part of this but finally paid the note.) For the annual premium due in 1928, he paid $46.20 in cash and gave his note for $125. This note was renewed at intervals until 1930, when with accrued interest, it amounted to $141.25. It was never paid by Tabler, but on April 2, 1930, he paid defendant $8.48, which was the amount of the advance interest (for one year) required to renew it for another year. In order to pay the annual premium due in 1929, Tabler signed a request that defendant "accept monthly premiums of $15.00 in advance (from Tabler Cleaning Company) . . . under the Company's Salary Savings Plan." Twelve of these payments were made (April, 1929, to March, 1930) which paid the 1929 premium. No payment of any kind (except interest above mentioned) was made after March, 1930, until May 6, 1930, when Tabler sent $30 to the company in connection with an application for reinstatement. This application dated May 5, 1930, stated that Tabler made "application for reinstatement of the above numbered policy which lapsed for non-payment of the premium." It showed that the unpaid premium was due March 2, 1930. Tabler had signed other similar applications for reinstatement on previous occasions, when he failed to pay the annual premium due in 1928 and in 1929 within the 31

days of grace after March 2nd of such years, and when he had failed to pay renewals of premium notes.

The application also contained the following provision:

"It is also hereby agreed that any settlement tendered in connection with the reinstatement of this policy may be deposited in order to facilitate action on this application for reinstatement if approved, with the understanding it will not be used for the purpose for which it was tendered, but will be recognized entirely as my property and held subject to my order . . . until the Company approves this application; if this application is not approved, I hereby agree to accept the return of any settlement tendered or sums paid in connection with this application, without interest."

On May 12, 1930, defendant wrote Tabler that "before we can take further action on your application for reinstatement, it will be necessary that we have a medical report from Dr. L. C. Miller." On June 24, 1930, Tabler wrote defendant inquiring as to the "present status" of the policy. The company replied as follows:

"We have remittance to cover the premiums due March 2 and April 2 on each policy, also needing the May and June premiums in connection with reinstatement. Before we can act on the applications it will be necessary that we have an examiner's report, and hope it will be possible for you to get in touch with Dr. Miller to complete the examination within the next few days."

On July 24, 1930, defendant (after the medical examination) wrote Tabler as follows:

"Our Insurance Committee was unable to approve your application for reinstatement of your policies that lapsed. Our check for $145.20, payable to the order of Harry C. Tabler, Jr., is enclosed. This is a refund of the amount which was tendered."

The check enclosed included the $30 deposited for the March and April payments on this policy on the monthly payment plan. This check was afterwards cashed by Tabler and he made no other payment on or application for reinstatement of this policy. It was shown that the cash value of the policy at the end of four years was $220; that at that time there was an indebtedness of $141.25 against the policy; that by giving credit for the amount sent in for prepayment of interest thereon ($8.48) this would be reduced to $132.77; and that this left a cash value of $87.23. It was further shown that at "thirty-one years of age (Tabler's age on March 2, 1930) the single premium for one year's insurance on $1,000.00 is $8.22, on $10,000.00 would be $82.20;" that "the daily cost per thousand for extended insurance is 2¼ cents;" that there was $5.03 more cash value than the amount necessary to pay for extended insurance, for one full year; and that "applying the daily rate to the balance of $87.23 it would give extended insurance for 387 days."

If the policy lapsed on March 2, 1930, as contended by the company, then the extended insurance provided by the nonforfeiture option (which it is conceded complied with our nonforfeiture statutes) terminated before Tabler's death. (His death was 607 days after March 2, 1930.) Plaintiff contends that the policy years must be computed from May 26, 1926, so that the policy would not lapse until May 26, 1930. (His death was 522 days after May 26, 1930.) Plaintiff claimed that the $30 (deposited by and paid back to Tabler) should have been used, as was the $8.48 for interest, to increase the cash value for extended insurance. This (at 2¼ cents per day) would have paid for 133 days extension which added to the 387 days granted by the company, would make 520 days. This would be only two days short, and plaintiff seeks to get seven days more by claiming credit for an alleged interest overcharge of $1.75. Plaintiff makes other contentions to the effect that defendant wrongfully breached its contract by declaring that the policy had lapsed and thereby relieved Tabler from the duty to tender future premiums. However, these are all based on the proposition that the premium was due annually on May 26th, and if that cannot be sustained all of these contentions fall with it. Therefore, the first question to be determined is: When was the annual premium due?

To fix time for payment of premiums as May 26th of each year, plaintiff relies upon Halsey v. American Central Life Ins. Co., 258 Mo. 659, 167 S. W. 951, McMaster v. New York Life Ins. Co., 183 U. S. 25, 22 Sup. Ct. 10, 46 L. Ed. 64, and decisions of our Courts of Appeals based upon the Halsey case. Defendant relies upon Prange v. International Life Ins. Co., 329 Mo. 651, 46 S. W. (2d) 523, 80 A. L. R. 950, and National City Bank v. Missouri State Life Ins. Co., 332 Mo. 182, 57 S. W. (2d) 1066. These later cases place certain limits upon the application of the Halsey case. [See also annotations on this subject 6 A. L. R. 774, 32 A. L. R. 1253, and 80 A. L. R. 957.] The rule of the Halsey case was thus stated by this court in the National City Bank case. ''If the policy provides for the payment of premiums annually, semi-annually, or quarterly, on or before certain days, occurring periodically after the date of the policy, and if the policy (or application) further provides that it shall not take effect until it is delivered and the first premium paid, and if in a given case a policy is delivered and the first premium is paid on a day subsequent to the date (specified), then in the event of an issue of liability for want of timely payment of premiums, the premium paying periods are to be determined from the date of delivery of the policy and of payment of the first premium.''

In the National City Bank case, it was pointed out that neither in the Halsey case, nor in any of the cases following it, ''was delivery of the policy by the insurance company and payment of the first

premium by the insured separate acts done at different times;'' but that ''in all those opinions in which the fact of delivery and first payment was stated, it was one transaction, done at the same time.'' In that case this court held that date of delivery should control over date of payment because, ''it neither is just nor logical that any one claiming under the contract of insurance made by (the insured) should receive from the courts, by reason of (his) tardiness in payment of the first premium, a more liberal construction of the contract than was given to the claimants in the cited cases where delivery and payment were one transaction.'' This court further said: ''Delivery of the policy being for the insurer, it is reasonable for the latter, in certain circumstances, should be the one to suffer by any delay or lapse of time in performance. But payment of the first premium is the reciprocal act of the insured, and he should not by any dilatory conduct be permitted to enhance the risk of the insurer.'' Such ruling is applicable here because prompt payment of the premium is for the benefit of the insurer and may be waived by it. [National City Bank v. Missouri State Life Ins. Co., supra; Berryman v. Southern Surety Co., 285 Mo. 379, 227 S. W. 96; Bernblum v. Travelers Ins. Co., 340 Mo. 1217, 105 S. W. (2d) 941.] It would be proper to find that it was waived in this case by delivery without payment and by its authorized agency's extension of credit therefor as shown by the charge made on Tabler's running account on its books.

It was also noted in the National City Bank case that, if the insured could postpone the time when his insurance began by delaying payment, he could make it begin at ''a time when, for the purposes of determination of insurance premiums (the insured), was one year older than when he signed the application.'' He could thereby get insurance at a rate lower than that to which he would be entitled at the time it became effective. In the Prange case, this court said that ''the insurance practice of reckoning age from the nearest birthday, given recognition by statute in this State (Sec. 5751, R. S. 1929), is one of which we take judicial notice;'' that ''there was in force at the time of the issuance of the policies in question a statute . . . which provided that there should be no discrimination between the policyholders with the same expectation of life in respect to the premiums they were required to pay;'' and that ''if the insured under the policy . . . was to be given the benefit of the premium rate applicable to age thirty-eight, it was necessary, in order to avoid the prohibited discrimination, that he be required to pay premiums at such a rate from a time within which thirty-eight years was in fact his insurance age.'' The statute referred to in the Prange case was an Arkansas statute but we have a similar statute in this State. [Sec. 5729, R. S. 1929.] It prohibits ''discrimination in favor of individuals between insurants . . . of the same class and equal ex-

pectations of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance." Violation of this statute by the representative of an insurance company is a misdemeanor punishable by a fine "not less than fifty nor more than five hundred dollars" and imprisonment "in the county or city jail for not less than thirty days nor more than six months, or by both such fine and imprisonment;" and it subjects an offending insurance company to the penalty of being barred from doing business in this State for a period of five years. [Sec. 5730, R. S. 1929.]

It is not shown that there could have been any other reason, for the provisions of the policy making the first year's term insurance run from March 2, 1926, to March 2, 1927, and making premiums payable annually thereafter of March 2nd, except to give Tabler this insurance contract at the rate provided for age twenty-seven (to which rate he was entitled at the date of application) without violating the discrimination statute. Since this policy was not described in or contemplated by his application, Tabler must have decided to accept it on the basis of its terms instead of the terms of the application. He knew something about insurance because he already had other insurance. Although it was not shown just when Tabler decided to accept this policy (or when he had knowledge of the premium charge against his account) he never offered to return it after it was delivered but continued to keep and did pay the amount charged against him. Whenever it was that he decided to accept it, when he paid for it he took it at a rate inapplicable after March 2nd. This policy provided for cash endowment as well as life insurance, and not only did the policy specifically state that the first premium paid for term life insurance "*ending on the Second day of March 1927,*" but the endowment period also ended on the 2nd day of March. Therefore, if Tabler lived and kept the policy in force he would have received payment of $10,000 almost three months earlier than under plaintiff's present contention as to its maturity. Computation demonstrates that the interest value of $10,000 for such period is a more substantial consideration than the proportional amount of the annual premium for the same time.

The principal basis of the Halsey case seems to be that unless the insurance continued for a full year after the delivery of the policy then the insured did not get anything for part of his premium money, That could not be true here because, by cutting down the first term paid for, Tabler did get something for that proportional part of his premium money. He got both a lower rate, throughout the whole life of his policy, and an earlier endowment maturity. He did thereafter at all times recognize March 2nd as the annual date for payment of premiums, and he must have known that he had the benefit of a rate he could not have had if it was based on any later date. There was

no change of age in the Halsey case between the date of the application or policy and the date delivery and payment, so that the discrimination statute could not have been violated by the construction on which the termination of the first year's insurance (and annual premium payment date) was fixed. In fact, the rule of the Halsey case could not be applied to the situation herein involved, where there had been in the intervening period a change of age for purposes of computation of premiums, because the premium provided by the policy would not pay for $10,000 insurance for a full year from May 26, 1926, when Tabler's premium was required to be computed at the rate for age 28. We hold that, upon the principles established by the Prange and National City Bank cases, we must construe this contract to fix the annual date for premium payments at March 2nd as stated in the policy, and that there is no reasonable basis for any later date.

Plaintiff further contends that even on defendant's theory that the policy lapsed for a failure to pay the premium due in March, 1930, it breached the contract by a failure and refusal to give effect to the automatic premium loan provision of the policy, thereby keeping it in force as originally written; and that, by accepting from the insured the sum of $8.48 as interest on April 3, 1930, and the sum of $30 paid on May 7, 1930, as two monthly premiums on the policy sued on, by entering the money on its premium collection reports, by placing it in its bank account, commingled with its other funds, by keeping the $30 until July 24, 1930, and by keeping the $8.48 and using it to purchase extended insurance, defendant waived all rights it might have had to forfeit the policy for nonpayment of premium. However, Tabler's application for the monthly payment plan of premium payment provided that, after defendant accepted it, "during such time it is agreed that the Automatic Premium Loan Option shall not be in effect." He made application for reinstatement, after the policy had lapsed for nonpayment of the premium due March 2, 1930, and tendered two monthly payments therewith, which would have entitled him to reinstatement only if the monthly payment plan was still effective. Moreover, it was not shown that there was sufficient value, as of March 2, 1930, in the policy above existing indebtedness to make an Automatic Premium Loan which could have kept the policy in force until Tabler died. As to the receipt of the $8.48 interest and the $30 tendered for monthly payments, these amounts were sent to defendant after Tabler failed to pay the premium due on the policy, and for the purpose of reinstatement. The application for reinstatement (hereinabove set out) authorized defendant to deposit "any settlement tendered in connection with the reinstatement" and agreed to accept the return thereof if the application was not approved. Tabler did accept the return of the $30 and received credit for the $8.48 as a reduction of his indebtedness to de-

fendant. He never took any action thereafter which indicated that he claimed any rights in the policy, other than extended insurance for one year and 22 days from March 2, 1930, and we hold that, on this record, he was entitled to nothing more.

The judgment is affirmed. *Ferguson, C.,* absent; *Bradley, C.,* concurs.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.