Regina M. PFINGSTEN, Respondent-
Appellant,

v.

FRANKLIN LIFE INSURANCE
COMPANY, Appellant,

Community Federal Savings & Loan Asso-
ciation of Overland, Respondent.

No. 47188.

Supreme Court of Missouri,

Division No. 1.

Dec. 14, 1959.

Motion for Rehearing or to Transfer to
Court en banc Denied Jan. 11, 1960.

Heneghan, Roberts & Cole and W. Munro Roberts, Jr., St. Louis, for appellant, Franklin Life Ins. Co., Harold B. Bamburg, St. Louis, of counsel.

Stanley R. Schuchat, Harold I. Elbert, St. Louis, for Regina M. Pfingsten. Thompson, Mitchell, Thompson & Douglas, St. Louis, of counsel.

Robert F. Stanton, Erwin Tzinberg, Clayton, for respondent Community Federal Savings & Loan Ass'n of Overland.

HOLLINGSWORTH, Judge.

Plaintiff, Regina M. Pfingsten, widow of Earl Pfingsten, deceased, is the beneficiary in a policy of insurance for the principal sum of $8,000, issued May 16, 1956, by defendant The Franklin Life Insurance Company (herein referred to as "Franklin") on the life of Earl Pfingsten (herein referred to as the "insured"), which was assigned to and held by defendant Community Federal Savings & Loan Association of Overland (herein referred to as "Community")

as collateral security for certain mortgage indebtedness of plaintiff and her insured husband to Community. Following the death of insured on October 27, 1956, and receipt of proof of his death, Franklin refused payment on grounds "the first premium was not paid during Mr. Earl Pfingsten's lifetime and good health." Plaintiff's action is pleaded in two counts.

Count One seeks judgment against Franklin for the face of the policy, with interest and damages for vexatious refusal to pay. Count Two (in the alternative if plaintiff is not entitled to recover on Count One) seeks judgment against Community for $8,000 and interest on grounds it had represented to plaintiff in a letter dated May 23, 1956, that it had paid the annual premium to Franklin. Community cross-claimed against Franklin, seeking indemnity against Franklin if held liable on Count Two, on grounds that, by reason of a course of dealing between it and Franklin, Community was not required to make payment of premiums on Franklin policies assigned to it as collateral at the time of delivery of such policies.

The jury found for plaintiff and against Franklin on Count One for $8,000, plus $734.40 interest and damages for vexatious refusal to pay in the sum of $800, total, $9,534.40; in favor of Community on Count Two; and in favor of Franklin on Community's cross-claim. Franklin appealed from the judgment rendered in favor of plaintiff on Count One. Plaintiff appealed conditionally from the judgment rendered in favor of Community on Count Two.

A brief summary of the pleadings will tend to clarify the issues presented. Insofar as material, plaintiff's petition alleges: That plaintiff and her husband delivered to Community their promissory note secured by deed of trust on their home in St. Louis County; that beginning prior to May 2, 1956, Franklin and Community had an arrangement whereby Franklin solicited persons indebted to Community to purchase life insurance policies from Franklin, the proceeds of which, in the event of death of insured, were to be used to pay on said indebtedness; that under said arrangement Community agreed with Franklin to pay the premiums on such policies, add it to the loan account of such persons and collect from the latter in twelve monthly installments; that on May 2, 1956, Earl Pfingsten was induced by Franklin to apply for the policy in issue, with the understanding that the policy issued would be assigned to Community and the annual premium charged to his loan account with and paid by Community; that under date of May 16, 1956, the policy applied for was issued and delivered to Community, together with the assignment thereof; that under date of May 23, 1956, Community notified the insured that the cost of the insurance had been paid by it and that the premium had been added to the loan balance of plaintiff and the insured, for which they were to repay Community at the rate of $9.14 per month; that insured had complied with all conditions precedent to issuance, delivery and liability under the policy; and that insured died on October 27, 1956, and Franklin had refused payment.

In its answer to Count One of the petition, Franklin admitted the issuance and delivery of the policy under date of May 16, 1956, and the death of the insured on October 27, 1956, denied that all conditions precedent to Franklin's liability had been performed, denied the arrangement alleged to exist between Franklin and Community with reference to payment of premiums on policies issued under such an arrangement, denied that the application for insurance signed by Earl Pfingsten provided that the policy would be assigned to Community; and then went on to allege as an affirmative defense that the application for insurance signed by Earl Pfingsten and the policy issued to him provided that those documents constituted the entire contract between them; that those instruments provided that the policy would not take effect unless and until delivered to insured or his assignee and the first premium paid during

the lifetime and good health of the insured; that the first premium was not paid until the 14th day of September, 1956, before which date insured had been diagnosed by medical men as having a tumor of the lungs and was hospitalized on May 22, 1956, at which time he was found to be suffering from tumor of the lungs; that insured was not in good health at the time the first premium was paid; and that said policy never went into effect for the reason that the aforesaid condition precedent to the existence of the policy was never met and fulfilled.

On July 1, 1955, plaintiff and her husband purchased a home in St. Louis County, at which time, for value received, they executed their note to Community secured by deed of trust thereon for the principal sum of $9,750, with interest at 6% per annum, payable $69.91 per month. At some time prior to May, 1956, Franklin approached Community for the purpose of obtaining prospects for the purchase of mortgage life insurance under Franklin's "Home Security Plan." Community agreed to the plan and thereafter, through an agency known as Quint Investment Company, furnished Franklin with the names of its mortgage borrowers. Under that plan, Franklin, at the time of taking an application for life insurance from one of Community's borrowers, would have him sign the Home Security Plan, which by its terms assigned all rights in the policy to Community, and further provided:

> "And to further secure said loan I hereby authorize and direct said Association, Community Federal Saving & Loan Ass'n of Overland, St. Louis, Missouri, to pay in advance the premiums as they become due on said Policy and to charge the amount paid therefor to my account in said ————, the same to be added to the loan and, together with interest thereon at the rate provided by said mortgage, I agree to pay in twelve equal monthly installments, said payments of such increase to be made in addition to the payments provided for in said mortgage."

Following receipt of letters from Community relative to purchasing mortgage insurance, Franklin's agent (John W. Matchell) on May 2, 1956, procured from Earl Pfingsten an application for the policy here in issue and at the same time insured signed the Home Security Plan. The application for the policy was in the form in general use by Franklin, except that it bore the following rubber-stamped notation thereon:

> "Issue on 1st or 15th of Month following approval—under Community Federal Savings and Loan Association of Overland."

It read, in part, as follows:

> "It Is Hereby Declared that all of the statements, representations and answers contained herein or given to the medical examiner, should examination be required, are full, complete and true. It Is Hereby Agreed: (1) * * * that no waiver or modification shall bind the Company unless in writing and signed by the President or Secretary * * * (3) That any policy issued hereon shall not take effect unless and until the policy has been delivered to the undersigned and the first premium paid during the lifetime and good health of the proposed insured (except as provided in the Receipt bearing the same number and date as this application if the entire first premium has been paid and acknowledged above and such receipt issued) in which event such policy shall be deemed effective as of the beginning of the first policy year as shown on such policy; * * *."

Plaintiff testified: When the application was signed, the agent said the plan was in full force and that insured did not have any worry and that the premium payments would be added to their loan account with Community starting in July. There was nothing wrong with her husband at all. He worked every day until the day he became ill in the latter part of May.

On May 10, 1956, Dr. John Roberts, a medical examiner for Franklin, called at the Pfingsten home and gave Mr. Pfingsten a physical examination, the report of which was signed both by the applicant and the doctor. The doctor told plaintiff that "he had passed; he said he was O. K." Two of the questions on the application to which the applicant is shown to have answered "No" are: (4) "Has your weight changed in past year?" and (10) "Have you ever had tuberculosis, spitting of blood, asthma, frequent cough or hoarseness, pleurisy or any other disease of the chest or lungs?"

The policy was issued and delivered under date of May 16, 1956, with a certificate stating that Franklin "has delivered to [Community] insurance policy number 1488161 (the policy here in issue) on your life." A bill for the amount of the premium was sent to Community when the policy was delivered to it.

On May 20, 1956, the insured collapsed; on May 21, 1956, he was examined by Dr. Irvin I. Berwald; on May 22, 1956, he was admitted to Faith Hospital.

In its regular course of business, Community, on May 23, 1956, sent a letter to the insured, enclosing the certificate above referred to, and further stating: "The small cost of this additional insurance has been paid by the Association. It is added to your loan balance, to be repaid by you at the small amount of $9.14 per month, thereby your monthly payment has been increased by this amount."

On August 11, 1956, plaintiff wrote Community, stating, insofar as legible and pertinent:

"Aug. 11, 1956

"Sir:

"I am sure must be mistake I have been paying on my Loan & had paid up to month May my hubsand got sick * * * I also wrote about Insurance I got wasnt on my Loan on House * * * Here is 25.00 6.39 pays up to July 1 and $9.14 mortgage

Ins. on my hubsand starting July 1st or is that correct If not please write me * * * the man said July 1 would be 1st pay on Insurance * * please write & tell me what is what Ive never stopped paying on my Loan. * * *"

After writing the above letter, plaintiff talked over the telephone with a lady from Community, who told her "everything was fine."

Catharine Sommerkamp, called as a witness by Franklin, testified: She is collection officer of Community. About the time she sent out the letter of May 23, she talked with Vernon Heinsz, Franklin's district manager, about the Pfingsten account. She told him that Community could not at that time pay the premium because the Pfingsten account was delinquent. Mr. Heinsz told her it would be all right to go ahead, hold the policy and at such time as the account became current to pay the premium. Heinsz left the policy and the certificate with Community and the witness sent the certificate and letter of May 23 to the Pfingstens. Following receipt of Mrs. Pfingsten's letter, Miss Sommerkamp "checked" with Franklin "because the premium didn't show up on the ledger card." In response thereto, Vernon Heinsz sent her the following penwritten note on Franklin's letterhead:

"9–10–56

"Miss Sommerkamp:

"The Pfingsten premium has not been paid. However the protection has been in benefit since Aug. 13th. It was charged to agent Matchell.

"It has been included on the enclosed statement.

Vern."

Community was never asked to return the policy to Franklin and never received any statement for the premium after May 23 prior to the one enclosed with the note of September 10 from Mr. Heinsz. Premiums on policies issued under the Home Se-

curity Plan were always paid subsequent to delivery of the policies. Community paid the premium on September 14, 1956.

Mr. Heinsz, called as a witness by Franklin, admitted writing the letter sent to Miss Sommerkamp on September 10, 1956, and that he was unable to explain why he had said therein that the policy had been in effect since August 13; admitted that no statements of the premium due on the Pfingsten policy were sent to Community between May 16 and September 10; admitted that under the plan in effect with Community "the policy is issued with this certificate for the applicant; the policy is sent to our regional office, forwarded to me; with the policy and certificate I forward a statement for the annual premium to the Community Federal and they forward —they take it from there and forward the check direct to our home office.

"Q. Sometime after that, in the general course of business? A. That's right."

He further admitted that even though the application signed by the insured was in the form in general use, yet the plan in effect between Community and Franklin was entirely different from Franklin's general method of delivering policies and collecting premiums; admitted that the policy is "delivered" when it is delivered to Community, and further:

"Q. On a mortgage policy with Community Federal Savings and Loan you never delivered the policy to the insured as mentioned in that application, did you, and it wasn't your practice to deliver it to the insured? A. No, sir.

"Q. It wasn't your practice to collect the premium at the time it was delivered, was it? A. No, sir.

"Q. It was your practice to let Community Federal collect? A. That's right.

"Q. And thereafter remit it to you? A. That's right."

At one point in Mr. Heinsz' testimony, he said the premiums billed to Community would not go beyond thirty days; at another point he said he had no recollection of such premiums going beyond thirty days.

Dr. Irvin Berwald, called as a witness in behalf of Franklin, testified: He is a physician and surgeon and was treating physician for the insured. He first examined insured on May 21, 1956. Insured complained of loss of weight, but the doctor did not remember any specific length of time. His notes showed "the man coughed, loss of weight, and coughs, he says he had it for ten years, and weight loss, attack of weakness yesterday. Rales—that means grating noise—to enter hospital tomorrow." The witness heard some symptoms in insured's lungs. In view of insured's general weakness the doctor sent him to Faith Hospital for a "checkup" on May 22.

Testifying from the hospital record introduced by Franklin, the doctor said that X-rays taken on that day at Faith showed tumors in insured's chest, the nature of which could not be determined by X-rays; that he had chronic bronchitis and some pleural adhesions; that it could not be determined whether he had "pneumonia, a tumor or what"; that further investigation followed to make sure if there was a tumor; that the report made following examination of a gland taken from under insured's arm on May 28 was negative, failed to show cancer, did not show a thing, it was normal tissue; that the "X-ray man" thought perhaps it showed a lymphatic tumor; "we thought, maybe, the mass he had on his chest was due to some blood disease"; that a bone marrow puncture did not show cancer; that trial treatments were made by X-ray to reduce the mass; that X-rays taken on June 18 showed the mass was reduced; that on June 22 the patient was dismissed to go home and to go to work; that the final diagnosis, as shown by the hospital record, signed by the witness on June 22, 1956, showed

"Tumor of lungs—bilateral lymphosarcoma?"

The doctor further testified that the insured became ill again on September 16; that on September *7th* (the witness apparently meant *17th*), upon examination at the hospital, a large lump was found in his groin, "a lymph node, metastatic carcinoma," meaning definite cancer; that it was the witness' opinion that the cancer was the result of the condition he had found when he first examined insured on May 21. The witness would not say, however, that insured had that condition as far back as January or even April of 1956. He further testified:

"A. * * * All I can say, and be truthful about it, by proof, is that Mr. Pfingsten had cancer September 7 (17), 1956—not before that. I have no proof of it.

"Q. But if I understood your testimony, the cancer you discovered on September 7 (17) was the outgrowth of the tumor you found—A. It could be an extension of it and probably is.

*      *      *      *      *      *

"A. We found a tumor May 22d, assuming by tumor we mean a shadow on the X-ray.

"Q. Would you say he had had that ten days before? A. I can't say that."

On the death certificate, introduced in evidence by Franklin, and which was signed by the witness, he had stated the cause of death was "Generalized metastasis. Interval between onset and death 6 mo. Antecedent causes Anaplastic carcinoma of lungs." He testified, however, that his statement, as to duration of the condition, was a "presumption on my part." "It is a presumption. I couldn't say whether it is six months, two months or one month, but we presume it is six months." The diagnosis made by the witness on June 22 was "tumor of lungs—bilateral lympho-sarcoma, *question mark*." The witness said he had "no idea" as to how long the insured had

the condition prior to examination of him on May 21, "I can't tell." The diagnosis was "presumptive", but the witness' best opinion as of that time.

Union work records introduced by plaintiff in rebuttal showed that the insured worked at his employment 162 hours straight time and 20 overtime hours in May; that he did no work in June or July; that he earned $687.55 in August; and that he worked two weeks in September.

■ Franklin, in reliance upon the above quoted "good health" provision contained in the application signed by the insured, contends that the trial court erred in overruling its motion for directed verdict filed at the close of all the evidence for the reason that the evidence showed *conclusively* that plaintiff was not in sound health at the time of the issuance and delivery of the policy. The law is clear that the burden rested upon Franklin to prove its affirmatively pleaded defense under the "good health" provision of its policy. See Section 509.090 RSMo 1949, V.A.M.S.; Poignee v. John Hancock Mut. Life Ins. Co., Mo.App., 147 S.W.2d 677, 681, certiorari quashed, State ex rel. John Hancock Mut. Life Ins. Co. v. Hughes, 348 Mo. 829, 155 S.W.2d 250; Burgess v. Pan-American Life Ins. Co., Mo., 230 S.W. 315, 321; Truitt v. National Life & Accident Ins. Co., 236 Mo. App. 1036, 161 S.W.2d 683, 685; Blanke v. American Life & Accident Ins. Co., Mo. App., 230 S.W.2d 134, 139. The good health provision provides, in substance, that the policy shall not take effect unless and until (1) the policy has been delivered and (2) the premium has been paid (3) during the good health of the insured.

■ The first question presented is: When was the policy delivered? As stated, the petition alleged and both Franklin and Community expressly admitted in their answers that it was *delivered under date of May 16, 1956.* The submission instruction given in behalf of both plaintiff and Franklin hypothesized a finding "that *on or about*

*May 16, 1956,* [Franklin] delivered said policy", etc. However, Franklin now insists that it was not delivered until May 23, 1956, which was three days after insured became ill and two days after an X-ray taken of insured at Faith Hospital was interpreted to reveal tumors of his chest. That contention stems from two sources: (1) The testimony of Franklin's witness, Miss Sommerkamp, that she had a conversation with Mr. Heinsz *on or about May 23, 1956,* (the day she sent the letter to plaintiff) and that prior to that time she had no knowledge the policy was being written, and further: "Q. This was prior to May 23, the date the letter was sent out, is that correct? A. I couldn't say that it was prior. I am not sure exactly what time * * * It was around that time; probably the same day." (2) Vernon Heinsz' testimony that when the policy was issued (in Springfield, Illinois) on May 16, it was sent to Franklin's office in St. Louis, where the premium statement and the Home Security Plan certificate were made up and, with the policy, forwarded to Community. Certainly, the vague recollection of Franklin's witness, Miss Sommerkamp, in 1959, concerning the precise date of a conversation had in May, 1956, even when coupled with the testimony of Franklin's witness Heinsz, cannot conclusively override the solemn judicial admission made in the pleadings. Wehrli v. Wabash Railroad Co., Mo., 315 S.W.2d 765, 773. Obviously, however desirous Franklin may be of establishing delivery of the policy subsequent to any evidence of illness of insured, it cannot, under the record as made, successfully maintain its present contention that the evidence *conclusively* shows the policy was not delivered until May 23.

■ The second question is: Under the evidence, did plaintiff make a submissible issue of waiver of the provision in the application signed by the insured that the policy should not become effective unless and until the first premium was paid? That provision, being for the benefit of the insurer, may be waived by an extension of credit either directly to the insured or anyone in his behalf. Berryman v. Southern Surety Co., 285 Mo. 379, 227 S.W. 96, 100; Bernblum v. Travelers Ins. Co. of Hartford, Conn., 340 Mo. 1217, 105 S.W.2d 941, 943; Tabler v. General American Life Ins. Co., 342 Mo. 726, 117 S.W.2d 278, 279; Lafferty v. Kansas City Casualty Co., 287 Mo. 555, 229 S.W. 750. Mr. Heinsz' admissions that, pursuant to its arrangement with Community, the policy was "delivered" to Community, that it was not the practice to collect the premium on delivery, and that Community "take[s] it from there" and thereafter remitted to Franklin in due course, considered in connection with the statement in his letter of September 10, 1956, that the premium was yet unpaid but that the "protection (of the policy) had been in benefit since August 13th", and the enclosure of a bill for the premium to Community, warrant a finding that the policy was in effect subsequent to delivery. Moreover, those admissions, when considered in connection with Heinsz' conversation with Miss Sommerkamp "on or about May 23, 1956," in which he told her to keep the policy and to pay the premiums when the Pfingsten account became current, clearly warrant a finding by the jury that Franklin, with full knowledge that the premium was not to be paid on delivery and that it remained unpaid on September 10, and its retention of the premium paid by Community on September 14, 1956, until confronted with a claim under the policy following insured's death on October 27, thereby had waived the provision that the premium be paid on delivery of the policy.

■ The third and final question on submissibility of plaintiff's case is: Does the evidence *conclusively* establish that insured was not in good health when the policy was delivered *on or about May 16?* Franklin contends that, inasmuch as the evidence, *which was introduced by it,* showed that on May 22 insured was suffering tumor of the. lungs, which thereafter

became malignant, this court should take judicial notice that he was not in good health when the policy was delivered, citing Childers v. National Life & Accident Co., Mo.App., 37 S.W.2d 490, 492, and Smiley v. John Hancock Mut. Life Ins. Co., Mo. App., 52 S.W.2d 12, 15. Suffice to say that those cases do not support Franklin's contention.

It further insists that, even though the court does not take judicial notice that insured was not in good health when the policy was delivered, yet the death certificate, signed by Pfingsten's physician (*and introduced in evidence by Franklin*), recited that insured's death on October 27 was caused by cancer and further recited "interval between onset and death 6 mo.," *constitutes conclusive* evidence that he "had the disease" as early as April 27, 1956, citing Frank v. Atlanta Life Ins. Co., Mo. App., 211 S.W.2d 940. In that case, however, *the plaintiff introduced the death certificate* and the court merely held that the certificate *introduced by plaintiff* established prima facie the cause of death to be as stated therein and that there was not evidence sufficient to contradict the certificate so as to make an issue of fact. For reasons hereinafter stated, that case is not controlling here.

█ A certificate of death furnished by the beneficiary is admissible to show the cause of death and, when not contradicted or explained, may preclude recovery. But it is prima facie only and is not to be taken as conclusive when other facts brought forward explain or contradict it as to make a submissible issue of its verity. Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S.W.2d 333, 339 [4]; Frank v. Atlanta Life Ins. Co., Mo.App., 211 S.W.2d 940, 942.

█ The application signed by insured shows that on May 10, 1956, at the instance of Franklin, plaintiff was required to and did submit to a medical examination by Franklin's medical examiner, Dr. John Roberts, as a prerequisite to issuance of the pol-

icy. In the absence of evidence to the contrary, we think it must be assumed that the doctor found insured to be in good health. Those facts, in and of themselves, constitute substantial evidence that insured was in good health at that time. See Clarkston v. Metropolitan Life Ins. Co., 190 Mo.App. 624, 176 S.W. 437, 438; Bruck v. John Hancock Mut. Life Ins. Co., 194 Mo.App. 529, 185 S.W. 753, 755; Tevlin v. Federal Life Ins. Co. of Chicago, Mo.App., 127 S.W.2d 743, 746; Remfry v. Mutual Life Ins. Co. of New York, Mo.App., 196 S.W. 775, 776–777. And even if the insured untruthfully answered some of the questions asked him, as Franklin argues, such fact goes only to the weight of the evidence. Scott v. National Life & Accident Ins. Co., Mo.App., 281 S.W. 67; Bruck and Remfry cases, supra. Furthermore, Franklin's witness, Dr. Berwald, declined to testify that the statement in the death certificate was more than a "presumption" on his part or at most an expression of his best opinion; that all he could say was that the insured had cancer on September 17; that he could not say that insured had the tumor ten days before the X-ray of May 22 was taken; that he had "no idea" how long the insured had the condition prior to his examination of him on May 21; that "I can't tell." A careful consideration of all of the evidence does not persuade us that the recitals in the certificate of death are to be taken as *conclusive* evidence that insured was not in good health "on or about May 16, 1956."

█ Neither do the recitals in hospital records introduced in evidence *by Franklin* and which Dr. Berwald *at the instance of Franklin* interpreted constitute a binding admission against plaintiff. They show at most the opinion of the physician or physicians who made them and the jury may determine their weight and value to the same extent as though the persons who made them were present at the trial and orally giving in evidence their opinions. Baugh v. Life & Casualty Ins. Co., Mo., 307 S.W.2d 660, 665.

■ The reviewing court does not weigh the evidence; it determines only whether there is sufficient evidence to support the verdict. In the instant case, we have concluded that the issue of insured's good health was a question for the jury.

Franklin's next contention is that "the trial court erred in giving plaintiff's instruction Number 1 * * * because [it] improperly permitted * * * a finding of waiver of Franklin's right to be paid a premium for its policy based upon jury findings (1) that plaintiff's decedent was examined by a physician for Franklin, because such fact was wholly irrelevant to the issue of waiver and was misleading; and (2) that Community agreed generally to pay insurance premiums for its customers because the evidence showed that in this particular case, Community did not agree to pay the premium; and (3) that Community and Franklin agreed that if Community's customer would sign an authorization, Community would add the premium to the customer's loan because there was no evidence of any such agreement."

■ The instruction is long and recites the evidence in detail. No purpose would be served by setting it forth in *haec verba*. It, however, is not erroneous in the respects assigned by Franklin. The evidence of examination of insured by Franklin's medical examiner was a circumstance for consideration of the jury in determining the issues of unconditional delivery of the policy on or about May 16 and the good health of insured on May 10, some six days before delivery. The evidence also warranted a finding by the jury: (1) that Community did agree to pay the premium; and (2) that Community and Franklin did agree that if insured signed an application and a policy was issued Community would add the premium to insured's loan.

■ Franklin's further contention is that "the trial court erred in refusing to give [its] requested instruction Number 1 for the reason that [Franklin] was entitled to have its theory of defense, namely, that

the premium was not paid at a time when plaintiff's decedent was in sound health, submitted to the jury." The difficulty with that contention is that although the instruction hypothesized, among other findings, a verdict for Franklin "if you further find that under the terms of said application it was expressly agreed by and between the said Earl Pfingsten and Franklin Life Insurance Company that no waiver or modification of the insurance contract shall bind the said company unless in writing and signed by the President or Secretary and that any policy issued on said application would not take effect unless and until the first premium be paid during the lifetime and good health of the said Earl Pfingsten," it omitted any reference whatever to plaintiff's evidence of waiver of the provision for payment of the premium on delivery of the policy. In essence, the instruction, after hypothesizing the aforesaid provision, further directed the jury: "and if you further find that on or about May 16, 1956, the Defendant Franklin delivered said policy of insurance to defendant Community under the terms of said Home Security Plan, but that defendant Community did not pay the first premium on said policy to defendant Franklin until September 14, 1956, if you so find, and if you further find that on or about May 22, 1956, the said Earl Pfingsten was afflicted with a tumor of the lungs, if you so find, and if you further find that said tumor of the lungs caused or contributed to cause the death of Earl Pfingsten, on October 27, 1956, if you so find, then you are instructed that, under the terms of the aforementioned application, the said Earl Pfingsten was not in good health at the time the first premium was received by defendant Franklin and that therefore said policy never went into effect, and you are further instructed that your verdict shall be in favor of the defendant Franklin Life Insurance Company * * *." It, in effect, directed a finding for Franklin even though insured was in good health when the policy was delivered on or about May 16, 1956, if the jury further found that the premium was not paid until September 14, 1956, and

that on May 22, 1956, insured was afflicted with a tumor that thereafter caused his death. It was clearly erroneous in ignoring the issue of waiver of payment of premium at time of delivery. Wood v. Kansas City Life Ins. Co., 228 Mo.App. 979, 75 S.W.2d 412, 414. See also: James v. Mutual Reserve Fund Life Ass'n, 148 Mo. 1, 49 S.W. 978, 980; Nichols v. Prudential Ins. Co. of America, 170 Mo.App. 437, 155 S.W. 478, 480; Heth v. John Hancock Mut. Life Ins. Co., Mo.App., 136 S.W.2d 392, 395; Lafferty's Adm'r v. Kansas City Casualty Co., Mo.App., 209 S.W. 942; 287 Mo. 555, 229 S.W. 750. The trial court did not err in refusing it.

■■■■ Franklin's final contention is that the trial court erred in permitting the jury to award a penalty against it for vexatious refusal to pay the proceeds due under the policy in suit. Vexatious refusal to pay is not to be deduced from the mere fact that upon trial the verdict is adverse to defendant. The word "vexatiously", as used in the statute, Section 375.420 RSMo 1949, V.A.M.S., means without reasonable or probable cause or excuse. Camdenton Consol. School District No. 6 of Camden County ex rel. W. H. Powell Lumber Co., v. New York Casualty Co., 340 Mo. 1070, 104 S.W.2d 319, 331. The test is whether the evidence and circumstances were such as to show the insurer's refusal was willful and without reasonable cause as the facts would have appeared to a reasonable man before trial. Rush v. Metropolitan Life Ins. Co., Mo.App., 63 S.W.2d 453, 456.

■■■ We think that Franklin was chargeable with knowledge prior to the filing of this suit that the premium was not to be and, in regular course of its arrangement with Community, would not be paid upon delivery of the policy and that it knew that the policy was effective on delivery if insured was then in good health. But we further think that Franklin had good reason to believe and did believe that insured was not in good health at the time of delivery. The evidence on that score presents a closely

debatable fact issue for the jury's determination. Consequently, we hold that the trial court erred in submitting an instruction on vexatious refusal to pay.

It is ordered that the judgment rendered in the trial court be and it is hereby modified by deleting therefrom the award of $800 for vexatious delay and all interest accrued on that amount since the date of judgment. Thus modified, the judgment is affirmed.

All concur.